691 A.2d 808

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. CHRISTOPHER ARTHUR, DEFENDANT–
RESPONDENT.

Argued December 3, 1996—Decided March 18, 1997.

*Deborah C. Bartolomey*, Deputy Attorney General, argued the cause for appellant (*Peter G. Verniero*, Attorney General of New Jersey, attorney).

*M. Virginia Barta*, Assistant Deputy Public Defender, argued the cause for respondent (*Susan L. Reisner*, Public Defender).

The opinion of the Court was delivered by

HANDLER, J.

A police officer, engaged in covert surveillance in an area known for heavy narcotics activity, observed defendant park his car on the street and a person enter the car on the passenger side, sit next to defendant for a short time, and then exit the car with a paper bag. The officer, believing that a drug sale had occurred, subjected the passenger to an investigatory stop and searched the bag. He found narcotics paraphernalia in the bag. Defendant's car, which had left the scene, was later stopped by the police. On being stopped, defendant spontaneously stated he had drugs in his pocket, as a result of which the police searched him and found cocaine.

The basic issue raised by defendant's conviction for possession of the cocaine is whether the officers had sufficient justification to carry out the investigatory stop of his car, which led to the seizure of the drugs from his person. Because the drug-related items seized from the passenger may have been a relevant circumstance giving rise to the reasonable suspicion that was necessary to justify the stop of defendant's vehicle, the Court must also consider whether the investigatory stop of the passenger and the seizure of drug paraphernalia from her were unlawful and, for that reason, invalidated the subsequent stop and search of defendant.

I

On June 26, 1993, Detective Harem Smallwood and a team of Plainfield narcotics detectives conducted an undercover surveillance operation on the 1100 block of West Third Street, an area known for drug trafficking. At approximately 12:20 p.m., Detective Smallwood observed, through binoculars from a distance of approximately 150 feet, a white Ford Tempo drive into the area and park on West Third Street. Nothing obstructed Detective Smallwood's view. It was a clear, sunny day. The driver, later identified as defendant, was the sole occupant of the automobile. Defendant sat alone in the car for about two minutes until a woman, later identified as Deborah Walls, walked up to the vehicle and entered it from the passenger's side. Detective Smallwood had not encountered either defendant or Walls before that day.

Defendant and Walls, who were visible to the detective only from the chest up, talked to each other in the car for about five minutes. As Walls emerged from the car, she "started looking around really suspiciously, looking back and forth up and down the street." She was carrying a brown paper shopping or grocery bag that had been rolled down so that it was approximately five inches high. Walls had the bag tucked under her arm "like a running back would hold a football," and she began walking away from the car. Defendant drove away in a different direction.

Detective Smallwood concluded that Walls had obtained the bag during her encounter with defendant, as the officer did not observe the bag on her when she entered the car and as Walls could not have concealed the bag under her clothing. He believed that he had just witnessed a drug transaction based on his experience as a detective in over 1,000 narcotics investigations, "the numerous times [he][had] seen people transferring and pass narcotics in paper bags and make dropoffs," "the area," and the suspicious nature of the pair's activities. The detective broadcast a description of defendant's vehicle and advised of its direction of travel. He then radioed Detectives Newman and Hoose, who were patrolling the area in a marked vehicle, and instructed them to stop Walls. Detective Hoose stopped Walls and immediately grabbed the bag from her. He looked inside and found between 100 and 200 glass vials containing a white residue. Walls was placed under arrest. Either Detective Hoose or Detective Newman radioed Detective Smallwood and advised him that Walls had been in possession of "used vials." Detective Smallwood would later testify that the glass vials used to package cocaine are regularly recycled by "the street people."

After hearing from Detectives Hoose and Newman, Detective Smallwood radioed a description of defendant's car, together with its license plate number, to all nearby units. He requested that defendant's car be stopped based on the suspicion that defendant possessed drugs or narcotics paraphernalia in his vehicle. Almost immediately after receiving Detective Smallwood's second transmission, Detectives Williams and Hawkins, patrolling in a marked car, spotted defendant's automobile approaching. They permitted defendant to pass, made a U-turn, and pulled over defendant's car. Both detectives exited the patrol car simultaneously. Detective Williams approached the Tempo from the driver's side, while Detective Hawkins approached from the passenger's side. As they neared defendant, the detectives ordered him out of the car. As he exited the vehicle, defendant blurted out that he had "bottles" in his back pocket. Detective Williams understood "bottles" to mean "glass vials of cocaine" in street parlance. He then

retrieved and confiscated three vials of crack cocaine from defendant's right rear pants pocket and placed him under arrest.

Defendant was indicted for third-degree possession of cocaine in violation of *N.J.S.A.* 2C:35–10(a)(1). Defendant later moved to suppress the cocaine alleging that the arresting officers did not have a legal basis for stopping his vehicle. The trial court denied the motion. Thereafter, defendant entered a guilty plea, reserving the right to appeal the denial of his motion to suppress. He was sentenced to three years of probation, ordered to perform five hours of community service every month for a year, and had his driving privileges suspended for six months. A $1,000 DEDR penalty, $50 lab fee, and $50 VCCB penalty were imposed.

On appeal, the Appellate Division reversed the denial of defendant's motion to suppress and remanded the matter. 287 *N.J.Super.* 147, 670 *A.*2d 592 (1996). This Court then granted the State's petition for certification. 145 *N.J.* 373, 678 *A.*2d 714 (1996).

II

The basic issue in this case is the validity of the officers' stop of defendant's automobile, which led to the seizure of drugs from defendant. The lower courts had two very different views of the significance of the several circumstances surrounding the stop of the vehicle.

On defendant's motion to suppress, the trial court found that the officers had formed a "clear articulable suspicion" sufficient to stop both Walls and defendant after Detective Smallwood had witnessed Walls leave defendant's vehicle with the paper bag. The court also found that the police were entitled to order defendant out of the car after the car had been stopped, and, that when defendant had informed the detectives that he was carrying "three bottles," the police had probable cause to search defendant and to seize the vials of cocaine. Further, the court concluded that, "even if the search and seizure of Miss Walls was improper," defendant's arrest would remain entirely lawful.

The Appellate Division concluded that the interplay between defendant and Walls was relevant in determining whether the stop of defendant had been justified. 287 *N.J.Super.* at 153, 670 *A.*2d 592. It noted that the transaction had occurred at midday, and that the detectives had had no previously acquired knowledge of defendant or Walls. It determined that Detective Smallwood had observed no transaction, no exchange of money, and no furtive gestures, and that he had "acted upon a hunch." *Ibid.* Commenting that "[p]urely innocent connotations [could] be ascribed to the observed conduct," *ibid.*, the Appellate Division concluded that the "totality of the circumstances ... did not rise to the level of reasonable suspicion." *Ibid.* Specifically, it found that the police had not possessed an articulable suspicion to stop defendant independent of the evidence seized from Walls. *Id.* at 153–54, 670 *A.*2d 592. According to the court, because the search of Walls had been unlawful, the fruits of that search could not have been used to support reasonable suspicion of illegal drug activity, and thus the stop of defendant had also been unlawful. *Id.* at 156–57, 670 *A.*2d 592.

The standards by which the reasonableness of police conduct involving an investigatory stop of a person or an automobile originate with *Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968). In *Terry*, the United States Supreme Court recognized that the Fourth Amendment's protection against unreasonable search and seizure limited law enforcement's ability to conduct investigatory stops and protective searches of persons suspected of criminal activity. The Supreme Court stated that the reasonableness of the police conduct in conducting an investigatory stop in light of the Fourth Amendment could be generally assessed by " 'balancing the need to search (or seize) against the invasion which the search (or seizure) entails.' " *Id.* at 21, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905 (quoting *Camara v. Municipal Court*, 387 *U.S.* 523, 536–37, 87 *S.Ct.* 1727, 1735, 18 *L.Ed.*2d 930, 940 (1967)). The facts used in that balancing test are to be judged objectively: "would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable

caution in the belief that the action taken was appropriate?" *Id.* at 21–22, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906 (internal quotations omitted). When determining if the officer's actions were reasonable, consideration must be given "to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909. Neither "inarticulate hunches" nor an arresting officer's subjective good faith can justify an infringement of a citizen's constitutionally guaranteed rights. *Id.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906. Rather, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Ibid.*

In *Adams v. Williams*, 407 *U.S.* 143, 92 *S.Ct.* 1921, 32 *L.Ed.*2d 612 (1972), the Supreme Court clarified the scope of *Terry:*

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.
>
> [*Id.* at 145–46, 92 *S.Ct.* at 1923, 32 *L.Ed.*2d at 616–17 (citations omitted).]

In *State v. Thomas*, 110 *N.J.* 673, 542 *A.*2d 912 (1988), this Court explicitly adopted the *Terry* analysis. The Court noted that the level of reasonable suspicion necessary to justify an investigatory stop is "something less than the probable cause standard needed to support an arrest." *Id.* at 678, 542 *A.*2d 912. The officer "must be able 'to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the intrusion." *Ibid.* (quoting *Terry, supra,* 392 *U.S.* at 21, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 906). There must be "some objective manifestation that the suspect was or is involved in criminal activity." *Ibid.* (citing *United States v. Cortez,* 449 *U.S.* 411, 417, 101 *S.Ct.* 690, 695, 66 *L.Ed.*2d 621, 628 (1981)); *see also State v. Valentine,* 134 *N.J.* 536, 636 *A.*2d 505 (1994) (finding *Terry* stop reasonable under totality of circumstances).

In 1975, *Terry* was explicitly applied to automobile stops in *United States v. Brignoni–Ponce*, 422 *U.S.* 873, 95 *S.Ct.* 2574, 45 *L.Ed.*2d 607 (1975). The Supreme Court held that "officers ... may stop vehicles only if they are aware of specific articulable facts, together with the rational inferences from those facts, that reasonably warrant suspicion that the vehicles" were involved in criminal activity. *Id.* at 884, 95 *S.Ct.* at 2582, 45 *L.Ed.*2d at 618. Considering whether the circumstances indicated possible criminal activity, namely, the presence of illegal aliens in the automobile, the Supreme Court ruled that the officers' unsubstantiated belief that the occupants of the car could be illegal aliens failed to provide a reasonable belief justifying the stop. . *Id.* at 885–86, 95 *S.Ct.* at 2582–83, 45 *L.Ed.*2d at 619.

In *Cortez, supra,* 449 *U.S.* 411, 101 *S.Ct.* 690, 66 *L.Ed.*2d 621, the Supreme Court approved an investigatory vehicle stop. Applying *Terry,* the Supreme Court determined that the test was not whether the officers had probable cause to conclude that the vehicle would contain illegal aliens, but whether the experienced officers, based on the totality of the circumstances, "could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity." *Id.* at 421–22, 101 *S.Ct.* at 697, 66 *L.Ed.*2d at 631.

The principles articulated by the United States Supreme Court in *Brignoni–Ponce* and *Cortez* have been applied and elaborated upon in a variety of contexts. For example, in *United States v. Trullo,* 809 *F.*2d 108 (1st Cir.), *cert. denied,* 482 *U.S.* 916, 107 *S.Ct.* 3191, 96 *L.Ed.*2d 679 (1987), the court held that in deciding whether to stop an automobile an officer could consider the nature of the area in which the conduct occurred, whether the conduct was suspicious, and whether the defendant's behavior was indicative "of some sort of illegal transaction" in light of the officers' experience. *Id.* at 111–12. The Circuit Court in *United States v. Santana,* 485 *F.*2d 365 (2d Cir.1973), *cert. denied,* 415 *U.S.* 931, 94 *S.Ct.* 1444, 39 *L.Ed.*2d 490 (1974), ruled that officers could legitimately conclude that they possessed enough information to justify

an automobile stop based on the presence of paper bags considered together with the defendant's reputation as a drug trafficker. *Id.* at 366, 368. The Ohio Supreme Court in *State v. Bobo,* 37 *Ohio St.*3d 177, 524 *N.E.*2d 489, *cert. denied,* 488 *U.S.* 910, 109 *S.Ct.* 264, 102 *L.Ed.*2d 252 (1988), sustained a police stop of the defendant's vehicle because the car was parked in a high crime area, the time was approximately 11:20 p.m., the defendant acted in a furtive manner, the officers knew area and were familiar with how drug transactions transpire, and the lead officer was a veteran who had made hundreds of arrests. *Id.* 524 *N.E.*2d at 491–92.

The facts and the rational inferences underlying the investigatory stop are derived from Detective Smallwood's observations. He perceived that (1) defendant drove his automobile into and parked on the street in an area known for high levels of narcotics activity; (2) Walls entered defendant's car, remained there for a short period of time engaged in conversation with defendant, and exited the vehicle carrying a paper bag she had not possessed when she entered the car; (3) defendant immediately drove off after Walls exited the vehicle; (4) paper bags are often used to transport drugs (*see, e.g., Santana, supra,* 485 *F.*2d at 366 (holding, before *Brignoni–Ponce* and *Cortez,* that automobile stop for investigatory purpose was proper, and noting that, although paper bags often contain items other than drugs, use of paper bags "has long been a sort of hallmark of the narcotics business")); and (5) Walls engaged in furtive movements upon exiting the vehicle and tried to conceal the bag that she had obtained from defendant. The detective thus concluded that defendant had engaged in illegal drug activity.

The Appellate Division reached a different conclusion in interpreting the facts known to Detective Smallwood. In recasting the significance of the observed facts, the appellate court failed to ascribe sufficient weight to the officer's knowledge and experience and to the rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's exper-

tise. The court noted that "[n]o transaction was observed." 287 *N.J.Super.* at 153, 670 *A*.2d 592. Although that is literally true, it was readily inferable that Walls had obtained the paper bag while inside defendant's car. The court also claimed that "[n]o furtive gestures were observed." *Ibid.* On the contrary, Detective Small-wood relied in part on Walls's looking around in a suspicious manner and the manner in which she carried the bag. *Id.* at 151, 670 *A*.2d 592. Finally, the appellate court gave little weight to the fact that defendant's car was located in an area known for drug trafficking. *Id.* at 153, 670 *A*.2d 592.

■ The Appellate Division also noted that "purely innocent connotations may be ascribed to the observed conduct." *Ibid.* The court's comment is not surprising. "It must be rare indeed that an officer observes behavior consistent only with guilt and incapable of innocent interpretation." *United States v. Viegas,* 639 *F*.2d 42, 45 (1st Cir.), *cert. denied,* 451 *U.S.* 970, 101 *S.Ct.* 2046, 68 *L.Ed.*2d 348 (1981). Police officers should consider whether a defendant's actions are more consistent with innocence than guilt; however, simply because a defendant's actions might have some speculative innocent explanation does not mean that they cannot support articulable suspicions if a reasonable person would find the actions are consistent with guilt. *E.g. Trullo, supra,* 809 *F*.2d 108, 111–12 (finding under "totality of the circumstances" that the defendant's movements could have been interpreted as consistent with those made by one engaged in a drug transaction sufficient to justify a stop for investigatory purposes and that the stop was justified even though purely innocent connotations could be ascribed to the observed conduct); *Viegas, supra,* 639 *F*.2d at 45 (holding that officers are not required to refrain from stops when activity could be innocently explained and stating that *Terry* standard does not require officers to determine if the defendant's acts "can be construed as innocent through speculation"); *Bobo, supra,* 524 *N.E.*2d at 492 (concluding under "totality of the circumstances" that the defendant's movements could have been inter-

preted as consistent with those made by one engaged in a drug transaction sufficient to justify stop for investigative purposes).

■ We are satisfied that the trial court correctly determined that the facts, apart from the drug paraphernalia seized from the passenger, as observed by Detective Smallwood in light of his experience, objectively gave rise to a reasonable and articulable suspicion that defendant was engaged in illegal narcotics activity. Thus, the stop of defendant's car was justified.

## III

The question implicit in that determination is whether on this record the facts giving rise to a reasonable suspicion of criminal conduct by defendant can be considered without regard to the drug paraphernalia seized from Walls. The Appellate Division, as noted earlier, determined that the seizure of evidence from Walls was itself invalid, and, because the stop of defendant was intertwined with the stop and search of Walls, the stop of defendant's car was invalid as well. 287 *N.J.Super.* at 154–57, 670 *A.*2d 592.

In reaching that conclusion, the Appellate Division determined first that defendant had standing to object to the prior illegal search of Walls. Because the evidence seized from Walls may be disregarded in determining the validity of the investigatory stop of defendant, we need not reach the question of whether defendant would have standing to contest the illegal search of the bag that Walls was carrying. Nevertheless, in view of the Appellate Division's perception that the events were interconnected and that defendant had standing to challenge the search of the passenger, it is appropriate to note certain considerations that bear on the issue of standing in the context of this case. Although *State v. Alston*, 88 *N.J.* 211, 227–29, 440 *A.*2d 1311 (1981), and *State v. Mollica*, 114 *N.J.* 329, 339, 554 *A.*2d 1315 (1989), established a broad standing rule, those decisions did not address the standing requirement in cases in which a defendant clearly had abandoned or relinquished his possessory interest in the property being seized or in which his participatory interest in that property had

become very remote or attenuated at the time of the seizure. *Cf. State v. Smith,* 291 *N.J.Super.* 245, 261–62, 677 *A.*2d 250 (App.Div. 1996) (finding standing in situation in which the defendant secretes drugs in an apartment to which he had unlawfully and forcibly gained entry, but refusing to suppress evidence because the defendant had absolutely no privacy interest in the place that was searched), *certif. granted* 149 *N.J.* 33, 692 *A.*2d 47 (1997). On the other hand, our standing rule is unquestionably broad and necessarily would apply where a defendant's abandonment or relinquishment of the seized items did not extinguish all privacy interests, *see State v. Hempele,* 120 *N.J.* 182, 576 *A.*2d 793 (1990), or where a participatory interest in evidence remains because, for example, a conspiracy or criminal enterprise is implicated. *See Mollica, supra,* 114 *N.J.* at 340, 554 *A.*2d 1315. We note, further, that our standing rule has been invoked only in cases in which a defendant has sought to suppress evidence that the State seeks to use directly against the defendant at trial, and not, in a case such as this, in which the seizure of the evidence allegedly violated the privacy interests of another person and is not sought to be used as evidence against the defendant to prove guilt, but only to justify an investigatory stop of the defendant.

We do not reach or resolve the issue of defendant's standing to challenge the seizure of drugs from Walls because we are satisfied that the investigatory stop of defendant's vehicle can be based on grounds giving rise to an articulable and reasonable suspicion of his criminal activity independent of the incriminating evidence seized from Walls. That determination is significant because it appears that the search of Walls was unlawful.

Under *Terry,* a limited exploratory search is permissible to preserve the safety of an officer if, under the circumstances, the officer reasonably believes that the suspect may be armed and dangerous. *Terry, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909; *see also Sibron v. New York,* 392 *U.S.* 40, 64, 88 *S.Ct.* 1889, 1903, 20 *L.Ed.*2d 917, 935 (1968) (ruling that the officer "must be able to point to particular facts from which he reason-

ably inferred that the individual was armed and dangerous"). The purpose of the search "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams, supra,* 407 *U.S.* at 146, 92 *S.Ct.* at 1923, 32 *L.Ed.*2d at 617. That search must be confined to an intrusion designed to discover weapons that could be used to assault the officer. *Terry, supra,* 392 *U.S.* at 29, 88 *S.Ct.* at 1884, 20 *L.Ed.*2d at 911. That dimension of the *Terry* doctrine requires that the presence of weapons must be apprehended. *See Ybarra v. Illinois,* 444 *U.S.* 85, 93–94, 100 *S.Ct.* 338, 343, 62 *L.Ed.*2d 238, 247 (1979) ("Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons.").

In *Thomas, supra,* 110 *N.J.* 673, 542 *A.*2d 912, this Court applied *Terry* to the frisk of a defendant and concluded that the record failed to establish "a specific and particularized basis for an objectively reasonable belief that defendant was armed and dangerous" on which the search could be based. *Id.* at 683, 542 *A.*2d 912. We reached a different result in *Valentine, supra,* 134 *N.J.* 536, 636 *A.*2d 505, because we concluded that all of the facts, when taken together, justified the officer's reasonable suspicion that the suspect could be armed and that the subsequent pat-down search was solely designed to discover weapons that could be used against him. *Id.* at 551–52, 636 *A.*2d 505; *see State v. Johnson,* 274 *N.J.Super.* 137, 154–56, 643 *A.*2d 631 (App.Div.) (concluding that the seizure and protective search of the defendant's pocketbook was justified based on the trooper's reasonable suspicion that a weapon was in the pocketbook and that his safety was in danger), *certif. denied,* 138 *N.J.* 265, 649 *A.*2d 1285 (1994).

■ Significantly, here, the detectives did not believe that Walls was armed and dangerous. Detective Smallwood's observation of a possible drug transaction between two people could not by itself justify a protective search. *Cf. Thomas, supra,* 110 *N.J.* at 684, 542 *A.*2d 912 (indicating that an officer might be justified in believing that a "substantial dealer in narcotics" in a "high-crime

area" could be armed and dangerous). Detective Smallwood and his colleagues harbored no such belief that Walls "was armed and dangerous." Rather, the police were simply attempting to discover drugs or drugs paraphernalia.

Thus, we conclude that although Detective Smallwood's observations justified the investigatory stop of Walls, they did not justify the subsequent search of her person. Nevertheless, it is clear that even though circumstances do not give rise to a reasonable suspicion that a person is armed, the person may still be subjected to a investigatory stop. *See State v. Garland,* 270 *N.J.Super.* 31, 42–43, 636 *A.*2d 541 (App.Div.) (concluding that the initial investigatory stop of defendant was permissible under *Terry,* even though the seizure and search of defendant's paper bag was invalid because officers had no reason to believe that the defendant was armed and dangerous), *certif. denied,* 136 *N.J.* 296, 642 *A.*2d 1005 (1994).

■ We find that the facts necessary to justify the investigatory stop of defendant can be properly considered without giving any separate and independent weight to the drug paraphernalia seized from Walls. The determination whether an articulable reasonable suspicion exists to undertake an investigatory stop of a person is based on an objectively-reasonableness standard. *Terry, supra,* 392 *U.S.* at 21–22, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906; *see also State v. Bruzzese,* 94 *N.J.* 210, 219–21, 463 *A.*2d 320 (1983) (holding that probable cause to search is based objectively on the understanding of an experienced and reasonable police officer), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984). This standard was correctly applied by the trial court in determining that, without regard to the evidence seized from Walls, the remaining facts, viewed objectively from the standpoint of an experienced and knowledgeable police officer, were sufficient to support an articulable and reasonable suspicion that defendant had been engaged in criminal activity. Consequently, the unlawful search of Walls is not a factor that would render illegal the otherwise objectively reasonable investigatory stop of defendant.

## IV

The final issue is whether the police lawfully searched defendant after his vehicle was stopped. Expanding the functional scope of *Brignoni–Ponce,* the United States Supreme Court held in *Pennsylvania v. Mimms,* 434 *U.S.* 106, 111, 98 *S.Ct.* 330, 333, 54 *L.Ed.*2d 331, 337 (1977), that a driver may be ordered to exit his vehicle after a *Terry* stop. Not only is this not a serious intrusion on the sanctity of the person, but it "hardly rises to the level of a petty indignity." *Ibid.* The Supreme Court ruled that "[w]hat is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Ibid.; cf. Maryland v. Wilson,* —— *U.S.* ——, 117 *S.Ct.* 882, 137 *L.Ed.*2d 41 (1997) (applying *Mimms* to passengers as well).

█ In *State v. Smith,* 134 *N.J.* 599, 637 *A.*2d 158 (1994), this Court explicitly adopted the principle articulated in *Mimms,* holding that an officer may order a driver to exit his vehicle after he had been "lawfully detained." *Id.* at 609, 637 *A.*2d 158 (quoting *Mimms, supra,* 434 *U.S.* at 109, 98 *S.Ct.* at 332, 54 *L.Ed.*2d at 336). After considering the enhanced protections offered by our State Constitution, the Court determined that *"Mimms* . . . as applied to drivers, satisfies the New Jersey Constitution." *Id.* at 611, 637 *A.*2d 158; *cf. id.* at 617–19, 637 *A.*2d 158 (refusing, prior to *Wilson,* to apply *Mimms per se* rule to passengers). There is, therefore, little doubt that the police acted appropriately when they ordered defendant to exit his vehicle.

█ After defendant exited his vehicle, he stated to the detectives that he had "bottles." Courts have recognized that "bottles" is a slang expression that is understood to mean vials of cocaine in crack form. *See, e.g., State v. Johnson,* 26 *Conn.App.* 779, 603 *A.*2d 440, 442 ("crack cocaine is packaged in small vials . . . the street term for such a vial is a 'bottle' "), *certif. denied,* 221 *Conn.* 925, 608 *A.*2d 690 (1992); *People v. Gomez,* 185 *A.D.*2d 154, 586 *N.Y.S.*2d 588, 590 (Murphy, P.J., dissenting) ("bottles . . . is street slang for crack"), *appeal denied,* 80 *N.Y.*2d 974, 591 *N.Y.S.*2d 144,

605 *N.E.*2d 880 (1992).  It is clear that in light of the evidence that "bottles" is a street term for "vials of cocaine," defendant's explicit admission of drug possession gave the detective probable cause to search defendant's person.

## V

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.