**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2744-19T3

STATE OF NEW JERSEY,

    Plaintiff-Appellant

v.

ADRIENNE L. HREHA,

    Defendant-Respondent.

_____

Argued telephonically June 2, 2020 –
Decided July 21, 2020

Before Judges Yannotti, Hoffman and Currier.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 19-02-0298.

Shiraz I. Deen argued the cause for appellant (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel J. Marzarella, Chief Appellate Attorney, of counsel and on the briefs; Shiraz I. Deen, on the briefs).

Alton D. Kenney argued the cause for respondent (Alton D. Kenney, attorney; Clifford P. Yannone and Alton D. Kenney, on the brief).

PER CURIAM

The State appeals, on leave granted, from an order entered by the Law Division on January 10, 2020, which granted defendant's motion to suppress evidence. We reverse.

I.

In February 2019, defendant was charged with third-degree possession of a controlled dangerous substance (CDS) (heroin), N.J.S.A. 2C:35-10(a)(1) (count one); third-degree possession of a CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(1) (count two); third-degree distribution of a CDS, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(3) (count three); third-degree possession of a CDS (Fentanyl), N.J.S.A. 2C:35-10(a)(1) (count four); third-degree possession of a CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(5) (count five); third-degree distribution of a CDS, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(5) (count six); first-degree strict liability drug-induced death of Richard Froman, N.J.S.A. 2C:35-9 (count seven); third-degree possession of a CDS (Xanax), N.J.S.A. 2C:35-10(a)(1) (count eight); third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(13) (count nine); and third-degree distribution of a CDS, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(13) (count ten).

Thereafter, defendant filed a motion to suppress evidence obtained in the search of the decedent's room, the items seized during the search, and the text messages recovered from the decedent's cell phone. Defendant also sought to suppress certain incriminating statements and other CDS defendant allegedly possessed and distributed. The judge conducted an evidentiary hearing on the motion.

At the hearing, Detective Thomas Scalzullo of the Ocean County Prosecutor's Office (OCPO) testified that on October 29, 2017, he was on night duty. Sometime after 9:00 p.m., Scalzullo received a call from Detective Brent Urichs of the OCPO's Major Crime Unit. Urichs asked Scalzullo to respond to a residence on Ray Drive to assist in the investigation of a death at that location. Scalzullo said the Toms River police had received an e-mail indicating the death may have been due to a drug overdose.

Scalzullo arrived at the residence on Ray Drive at around 10:00 p.m. It was a two-story house, which had been rented to several persons. A few residents were present, along with Toms River police officers, and a detective from the Ocean County Sheriff's Office. An officer led Scalzullo to Froman's room. He saw Froman's body, which was on the bed. He had been pronounced dead. At the time of his death, Froman was twenty-nine years old.

Scalzullo stated that they were trying to determine if there had been foul play but he did not observe any trauma. Initially, Scalzullo did not observe anything "significant" so he and another detective looked around Froman's room. In the top drawer of a dresser, Scalzullo found seven wax folds with suspected heroin and part of a straw. Scalzullo suspected the wax folds had been used to package heroin, and the straw could have been used to smoke or snort the drug.

Scalzullo testified that he was looking for evidence related to a potential overdose, but he could not recall whether the dresser drawer had been open or closed. Scalzullo also found a cellphone in the room, which he seized for further investigation. He stated that the phone was in Froman's room but he could not recall where he found it.

Scalzullo obtained the phone number for Froman's mother, Laura Tice-Boden, from an officer on scene. The officer was related to Tice-Boden by marriage. Scalzullo stated that it was the Major Crime Unit's policy to get consent from the next-of-kin of a decedent before searching through the decedent's phone.

Another officer called Tice-Boden and informed her that her son was dead. Scalzullo got on the phone. He said Tice-Boden was very upset but "very

4

cooperative." He asked if she would be able to sign a consent form giving the detectives permission to search Froman's cellphone for information related to his death. She agreed and planned to meet with Urichs. Scalzullo turned the phone over to Urichs the following day. He said he did not open the phone until he had Tice-Boden's consent.

Scalzullo testified that when he responded to the residence on Ray Drive, he did not know whether Froman had executed any documents that would have given Tice-Boden authority to consent to a search of his phone upon his death. He stated that he did not believe he had to obtain a search warrant to open the phone once he received Tice-Boden's consent.

Urichs searched the phone on October 30, 2017. Tice-Boden appeared at the OCPO the following day. She was presented with and signed a digital consent form, which authorized the officers to search Froman's phone. Before she signed the consent form, Urichs used the phone to send text messages to defendant. According to the State, the text messages implicated defendant in the sale of the drugs that resulted in the decedent's death. Urichs also used the phone to arrange meetings with defendant, which resulted in additional charges.

Tice-Boden testified that she and her husband had been traveling throughout the country, and they had been living in a recreational vehicle. On

5

October 29, 2017, Tice-Boden was in North Carolina when one of Froman's housemates sent her a message on Facebook informing her that her son had died.

Tice-Boden said that, at some point that night, she spoke with Scalzullo. She told Scalzullo he could take her son's cellphone. She said her son's car was in front of his residence and the investigators could take "absolutely anything" that might be helpful.

Tice-Boden explained that her brother-in-law was one of the officers at the scene when her son's body was found. She gave her brother-in-law permission "to sign anything or do anything that need[ed] to be done" to aid the investigation.

Tice-Boden returned to New Jersey and on the morning of October 31, 2017, she met with Urichs. She signed a consent form authorizing the OCPO to search Froman's phone. Tice-Boden said she would have done anything in her power to help the police determine what happened to her son. She stated this included giving the police consent to search her son's phone for any evidence that could "hopefully lead to an arrest of a person who was involved."

Tice-Boden further testified that she paid for her son's cellphone but to her knowledge, her son was the only person who had control of the phone and used it. She did not recall any of the officers indicating they were planning to

obtain a search warrant or asking whether she had any ownership interest in the phone. She stated that Froman rented the room in the house at Ray Drive for his own use. She said it was a separately secured room.

Tice-Boden asked Urichs whether her son's phone was locked, and he told her he had taken possession of the phone. Urichs said he was able to get into the phone "right away" because it was not protected by a password. According to Tice-Boden, Urichs indicated he was "able to read things" on the phone and he would return the phone to her after the OCPO was done with it.

Tice-Boden also stated that at the time of her October 31, 2017 meeting with Urichs, she knew the OCPO had been "using [the phone] actively . . . as part of the investigation." She did not believe anyone had accessed the contents of the phone until after she gave Scalzullo permission to do so in the telephone conversation on October 29, 2017.

## II.

In a written opinion, the motion judge noted that the Fourth Amendment to the United States Constitution and Article 1, paragraph 7 of the New Jersey Constitution, protect persons from unreasonable searches and seizures. The judge noted that warrantless searches are presumptively unreasonable. The judge observed that where the police act without a warrant, the State has the

burden of showing that the search or seizure was based on probable cause and fell within one of the recognized exceptions to the warrant requirement.

The judge found defendant had standing to challenge the validity of the search of Froman's room and cellphone and the seizure of evidence obtained in the search. The judge stated that defendant had a participatory interest in the communications with Froman, which implicated her in the charges for CDS possession, distribution and strict liability homicide charges. The judge also stated that defendant had standing to challenge the search of Froman's dresser because "she is the individual who presumably provided heroin to the decedent prior to his death."

The judge determined that the community caretaking and emergency aid doctrine justified the initial entry by the police into Froman's room but did not authorize the warrantless search of the room. The judge determined that the State did not establish that the phone, CDS, or the drug paraphernalia were in plain sight in the room. The State also failed to establish that Tice-Boden had actual or apparent authority to consent to the search of her son's phone. Moreover, the judge found that the doctrine of inevitable discovery did not apply.

A-2744-19T3

The judge therefore concluded that the evidence the police obtained in the search of Froman's room, the items found in the search, and text messages on Froman's cellphone must be suppressed. The judge also concluded that the text messages between Urichs and defendant and the CDS seized as a result of these communications, must be suppressed as the fruit of the unlawful search and seizure of evidence. The judge memorialized his decision in an order dated January 10, 2020.

The State thereafter filed a motion with this court seeking leave to appeal from the court's order. While the motion was pending, the motion judge filed an amplification of his reasons for granting defendant's motion to suppress, pursuant to Rule 2:5-1(b). We entered an order dated March 9, 2020, granting the State's motion for leave to appeal.

III.

On appeal, the State contends the motion judge erred by finding defendant had standing to challenge the search of Froman's room, the seizure of the evidence found in the search, and the text messages found on Froman's cellphone. The State argues that defendant did not establish that she had a proprietary, possessory or participatory interest in the evidence.

9

The United States Constitution and the New Jersey Constitution protect the people from unreasonable searches and seizures. State v. Randolph, 228 N.J. 566, 581 (2017) (citing U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7). A person alleging a violation of the Fourth Amendment must show that law enforcement violated "an expectation of privacy" that the person "possessed in the place searched or the item seized." Id. at 582 (quoting United States v. Salvucci, 448 U.S. 83, 93 (1980)).

However, under the New Jersey Constitution, a "criminal defendant is entitled to bring a motion to suppress evidence obtained in an unlawful search and seizure if he has a proprietary, possessory or participatory interest in either the place searched or the property seized." Id. at 581-82 (citing State v. Alston, 88 N.J. 211, 228 (1981)). The State has the burden to show that the defendant lacks standing to challenge the unlawful search or seizure. Id. at 582 (citing State v. Brown, 216 N.J. 508, 528 (2014)).

Where a defendant is charged with an offense in which possession of the seized evidence is an essential element, the defendant has "automatic standing." Alston, 88 N.J. at 228. In such a case, the defendant is deemed to have the requisite proprietary or possessory interest in the seized evidence to confer standing. A defendant also may have standing to challenge the search and

seizure of evidence if the defendant has a participatory interest in the place searched or the property seized. Ibid. (citations omitted).

"A participatory interest in seized evidence . . . stresses the relationship of the evidence to the underlying criminal activity and defendant's own criminal role in the generation and use of such evidence." State v. Mollica, 114 N.J. 329, 339 (1989). The fact "[t]hat evidence implicates a defendant in a crime is not, in and of itself, sufficient to confer standing." State v. Bruns, 172 N.J. 40, 58 (2002). Rather, "[t]here also must be at a minimum some contemporary connection between the defendant and the place searched or the items seized." Ibid.

In Bruns, the defendant was charged with armed robbery. Id. at 44. He challenged the search of a third-party's automobile, during which the police found and seized a knife and toy handgun used in the robbery. Ibid. The Court noted that New Jersey generally applies a broad standing rule when a defendant seeks to challenge the search and seizure of evidence on constitutional grounds. Id. at 53.

The Court stated, however, that its "decisions did not address the standing requirement in cases in which a defendant clearly had abandoned or relinquished his [or her] possessory interest in the property being seized or in which his [or

her] participatory interest in that property had become very remote or attenuated at the time of the seizure." Ibid. (quoting State v. Arthur, 149 N.J. 1, 12-13 (1997)).

The Court observed that the weapons seized in the search "did not relate to any ongoing criminal activity between" the defendant and the persons who were occupying the car when it was searched. Id. at 58. The robbery occurred seven days before the items were seized, and there was no evidence the defendant was engaged in "a continuing criminal relationship" with one of the occupants of the car. Ibid. In addition, the defendant presented no evidence at trial indicating he handed the weapons to an occupant of the car for safekeeping. Ibid.

The Court stated that in most cases in which the police seize evidence that implicates a defendant in a crime, the defendant will be able to establish an interest in property seized. Id. at 59. However, the "broad standing rule necessarily has limits." Ibid. The Court explained that:

> [i]f substantial time passes between the crime and the seizure of the evidence, and a proprietary connection between defendant and the evidence no longer exists, the defendant's basis for being aggrieved by the search will have diminished. In addition to the temporal aspects of a specific search or seizure, a showing that the search was not directed at the defendant or at someone who is connected to the crime for which he

has been charged also will diminish a defendant's interest in the property searched or seized. See [United States v. Smith, 621 F.2d 483 (1980)] (finding no standing where defendant was objecting to [a] search undertaken for reasons completely unrelated to his alleged criminal activity).

[Ibid.]

The Court held that the defendant did not have standing to challenge the search of the vehicle. Ibid. The Court pointed out that seven days had passed between the seizure of the evidence and the armed robber and the defendant was not in physical proximity to the evidence when it was seized. Ibid.

Here, the record does not disclose when defendant allegedly sold the CDS that resulted in Froman's death. Nevertheless, at the time the police searched Froman's room, defendant had relinquished any possessory or proprietary interest in the CDS allegedly sold to Froman. Furthermore, defendant was not charged with any offense for which possession of the cellphone was an element.

Furthermore, at the time of the search, defendant did not have any contemporaneous connection with Froman's room, his cellphone, the CDS, or the drug paraphernalia. There also was no evidence that when the search occurred, defendant and Froman were engaged together in any ongoing criminal activity.

13

Moreover, according to Scalzullo, the officers searched Froman's room to identify the cause of Froman's death and protect other occupants of the residence from any dangerous CDS. The search was not directed at defendant or any specific criminal activity. Therefore, defendant did not have standing to challenge the search of Froman's room or the seizure of the CDS, the drug paraphernalia, and his cellphone.

We also conclude that defendant did not have standing to challenge the search of Froman's phone and the seizure of the communications between defendant and Froman on the phone. According to the State, the text messages on the phone connect defendant to the sale of CDS that caused Froman's death. We are convinced, however, that when the police searched the phone, defendant did not have a participatory interest in the text messages found on that device.

The sale of the CDS took place sometime before Froman's death and the subsequent search of his room and seizure of the phone. As stated previously, there is no evidence that when the search occurred, defendant and Froman were engaged in any ongoing criminal activity. The text messages apparently related to the CDS transaction, which had been concluded earlier. Moreover, it appears that the police did not open the phone and read the text messages until several days after Froman's death.

14

We conclude that at the time the detectives searched the phone and read the text messages, defendant did not have a sufficient participatory interest in the text messages to confer standing to challenge the search of the phone and seizure of the messages. According to the State, the messages implicate defendant in the offenses related to the distribution of CDS to Froman which allegedly caused his death. However, this is not sufficient to confer standing to challenge the search and seizure on constitutional grounds. Bruns, 175 N.J. at 57-58.

Our recent decision in State v. Armstrong, __ N.J. Super. __ (App. Div. 2020), supports our conclusion that defendant does not have standing to challenge the search of the phone and the seizure of messages implicating defendant. In Armstrong, the defendant was charged with the murder of Rhasan Heath. Id. at __ (slip op. at 2). The defendant filed a motion to suppress certain text messages he sent to Nache DeWitt, who was his former girlfriend and the mother of his child. Ibid.

At the time of the murder, DeWitt was Heath's paramour. Id. at 2-3. It appears that on the night of the murder, DeWitt was with Heath, and the defendant sent her texts and calls on her cellphone, which were threatening. Id. at 3. DeWitt did not respond to the defendant's texts and phone calls. Ibid.

The State claimed the defendant was enraged and went in search of DeWitt. Ibid. The defendant saw DeWitt and her daughter leave the building and an altercation ensued. Ibid. When Heath emerged, the defendant began to shoot him. Ibid. Heath ran into the street and was struck by a car. Ibid. As he lay at the curb, the defendant shot him three times and killed him. Ibid.

We held that the defendant did not have standing to challenge the search of DeWitt's phone and the seizure of the text messages and calls on that device. Id. at 27-28. We concluded that the defendant did not have a participatory interest in the text messages and calls. Ibid.

We observed that "the mere fact that the text messages could be evidence used by the State to prove [the] defendant's commission of a crime does not confer standing upon him to seek their suppression." Id. at 27 (citing Bruns, 172 N.J. at 38). We noted that the defendant and DeWitt were not co-conspirators, nor was defendant her accomplice in the murder. Id. at 28. We pointed out that the criminal activity at issue was the deadly shooting of Heath, and this criminal activity did not generate the evidence. Ibid.

Here, the alleged criminal activity is the distribution of CDS that allegedly caused Froman's death. According to the State, the messages related to the CDS transaction, but time had passed between the communications and the seizure of

the evidence and defendant and Froman were not engaged together in any ongoing criminal activity. The search of the phone and its contents were not directed at defendant. Under the circumstances, defendant's interest in the search and seizure of the phone and its contents was diminished.

## IV.

The State argues that even if defendant has standing to challenge the seizure of the text messages found on Froman's phone, the search of the phone and the seizure of the messages did not violate her rights under the United States Constitution or the New Jersey Constitution. We agree.

In State v. Evers, 175 N.J. 355, 368-69 (2003), the Court noted that in order to invoke the protections of the Fourth Amendment of the United States Constitution or Article I, paragraph 7 of the New Jersey Constitution, a defendant must show that he or she had "a reasonable or legitimate expectation of privacy" that was violated by someone in law enforcement. The defendant must establish that he or she had "an actual (subjective) expectation of privacy," and "one that society is prepared to recognize as reasonable." Id. at 369 (quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); State v. Marshall, 123 N.J. 1, 66-67 (1993)).

A-2744-19T3

The Court explained that "[a]n individual ordinarily surrenders a reasonable expectation of privacy to information provided to a third party. If that third party discloses the information to the government, the individual, who falsely believed his confidence would be maintained, will generally have no Fourth Amendment claim." Id. at 369 (citing United States v. Miller, 425 U.S. 435, 443 (1976); Guest v. Leis, 255 F.3d 325, 333 (6th Cir. 2001)).

The Court held that the defendant did not have a reasonable expectation of privacy with regard to two photos of underage nude girls that he e-mailed to fifty-one subscribers to a chatroom. Id. 370. The Court noted that the defendant transmitted the e-mail "at peril that one of the recipients would disclose his wrongdoing." Ibid. The Court observed, "There is no constitutional protection for misplaced confidence or bad judgment when committing a crime." Ibid. The Court also held that defendant had no reasonable expectation of privacy under the Federal or State Constitution in the subscriber information store at AOL headquarters in Virginia. Id. at 370-74.

In Armstrong, we noted that while our Supreme Court had declined to follow the third party doctrine where the third party is a common carrier, an internet provider, or a bank, the Court has applied the doctrine to person-to-person digital communications. Armstrong, __ N.J. Super. at __ (slip op. at 18).

A-2744-19T3

We held the defendant did not have a reasonable expectation of privacy in the text messages he sent to another individual once that individual received the messages. Id. at 19.

The same conclusion applies here. Defendant did not have a reasonable expectation of privacy in text messages she sent to Froman once they were received. See also State v. Patino, 93 A.3d 40, 55-56 (R.I. 2014) (holding that because a recipient shares control of a sender's message, the sender does not have a reasonable expectation of privacy in the message on the recipient's device); Hampton v. State, 295 Ga. 665, 763 (2013) (concluding defendant had no expectation of privacy in text messages stored on the phone that the defendant did not own); State v. Tentoni, 871 N.W.2d 285, 287 (Wis. Ct. App. 2015) (finding that the defendant did not have an objectively reasonable expectation of privacy in text messages he sent and recovered through a warrantless search of the recipient's phone); Leis, 255 F.3d at 333 (noting that individual who sends an e-mail does not have a legitimate expectation of privacy in an e-mail that reached its recipient); and United States v. Jones, 149 Fed. Appx. 954, 957 (11th Cir. 2005) (holding that co-conspirators do not have a reasonable expectation of privacy in their text communications).

This conclusion also applies to the messages defendant sent to the detective, who communicated with her using Froman's phone. As noted, in Evers, the Court held that the defendant had no expectation of privacy in an email sent to numerous recipients, including an undercover police officer. 175 N.J. at 370. The fact that defendant allegedly sent the text messages to the detective only, in the belief that she was communicating with Froman, is of no moment. Defendant did not have a reasonable expectation of privacy in the messages after she sent them and they were received by the detective.

IV.

In addition, the State argues that the motion judge erred by finding that Tice-Boden did not have authority to consent to the searches of the decedent's room and his phone. The State also argues that Scalzullo reasonably believed Tice-Boden had apparent authority to consent to the searches.

"A search conducted pursuant to consent is a well-established exception to the constitutional requirement that police first secure a warrant based on probable cause before executing a search of a home." State v. Cushing, 226 N.J. 187, 199 (2016) (quoting State v. Domicz, 188 N.J. 285, 305 (2006)). A third party may consent to a search if that party has "joint occupation of" and "common authority" over the premises or the property being search. Ibid. (citing

Fernandez v. California, 571 U.S. 292 (2014); Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)).

Furthermore, a law enforcement officer may rely upon the consent of a person who has apparent authority to provide such consent. Ibid. The doctrine of apparent authority applies when the third party "(1) does not possess actual authority to consent but appears to have such authority and (2) the law enforcement officer reasonably relied, from an objective perspective, on that appearance of authority." Id. at 199-200 (citing Rodriguez, 497 U.S. at 185-89).

Here, the motion judge found that when the police searched Froman's room and phone, Tice-Boden did not have actual authority to consent to the searches. The judge noted that the State had taken the position that since Tice-Boden was Froman's next-of-kin, she had the authority to consent to the searches in the immediate aftermath of his death. The judge found, however, that at the time of the searches, Tice-Boden did not have a legal or equitable entitlement to her son's personal property.

On appeal, the State asserts that Froman did not have a will when he died and Tice-Boden became the legal owner of the decedent's property when he died. In support of that contention, the State relies upon N.J.S.A. 3B:5-4. Among other things, the statute provides that if a decedent dies intestate and has no

surviving spouse or domestic partner, the decedent's estate passes first to [the decedent's] descendants and, if there are no surviving descendants, "to the decedents' parents equally if both survive, or to the surviving parent, except as provided in [N.J.S.A. 3B:5-14.1]; . . . "  N.J.S.A. 3B:5-4(a), (b).

Here, the State failed to show Tice-Boden had actual authority to consent to the searches of her son's room and phone when the searches took place.  She testified she is the decedent's next-of-kin, but she did not explain if her son had any descendants.  As a surviving parent, Tice-Boden may have had an interest in the estate under N.J.S.A. 3B:5-4, but there is no indication that she had a right to control her son's property immediately upon his death.  Furthermore, as the motion judge pointed out, Tice-Boden was not named administratrix of her son's estate until months after the search took place.

The State also failed to establish that Scalzullo reasonably believed Tice-Boden had apparent authority to consent to the search.  As the motion judge noted, Scalzullo did not elicit from Tice-Boden sufficient facts which would have given him a reasonable basis to assume she had authority to consent to the searches.  Tice-Boden never gave the detective any indication she had control over the room where Froman was living at the time of his death or his phone.

Indeed, at the hearing, Tice-Boden explained that Froman had sole control of his room and the phone belonged to him.

We nevertheless conclude that, while Tice-Boden did not have actual or apparent authority to consent to the search of Froman's room or his phone, the lack of such consent does not require suppression of the evidence. As we have determined, defendant does not have standing to challenge the search and seizure of the evidence.

Furthermore, even if defendant has standing to seek suppression of the evidence, the motion to suppress should have been denied because defendant did not have a reasonable expectation of privacy in the premises where Froman was living when he died, his cellphone, or the messages found on his phone. Moreover, there was no basis to suppress the text messages defendant exchanged with the detective, defendant's incriminating statements, or the CDS seized as a result of those conversations.

Reversed and remanded to the trial court for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2744-19T3