19 A.3d 1023 (2011)
420 N.J. Super. 167
STATE of New Jersey, Plaintiff-Respondent,
v.
Joseph ADUBATO, Defendant-Appellant.
No. A-3419-09T1.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 2011.
Decided May 23, 2011.
*1026 Matthew T. Priore, Montvale, argued the cause for appellant.
David A. Malfitano, Assistant Prosecutor, argued the cause for respondent (John L. Molinelli, Bergen County Prosecutor, attorney; Dyanne Veloz Lluch, Assistant Prosecutor, of counsel and on the brief).
Before Judges CARCHMAN,[1] MESSANO, and WAUGH.
The opinion of the court was delivered by
WAUGH, J.A.D.
Defendant Joseph Adubato appeals his conviction for driving while intoxicated in violation of N.J.S.A. 39:4-50 (DWI). He pled guilty to the offense following denial of his motion to suppress evidence. We affirm.

I.
We discern the following facts and procedural history from the record on appeal.
Shortly after 10:00 p.m. on August 8, 2008, North Arlington Police Officer Michael Horton received a message from the police dispatcher to the effect that a caller had reported a vehicle with a specific license plate driving around on Belmont Avenue. According to Horton, the dispatcher told him that the caller had said that the vehicle was "continually driving around the neighborhood, and the driver keeps exiting the vehicle." Defense counsel also read an entry from the dispatcher's notes into the record at the beginning of the hearing: "And I can read that into the record. `22:05 caller ... repeats vehicle driving around neighborhood, male. Then driver keeps exiting the vehicle[.] [A]nd there's a license plate number provided.'" Horton, who did not know or speak to the caller, testified that he "believe[d] [the dispatcher] indicated that it was a possible intoxicated male."[2]
When Horton and his partner arrived at Belmont Avenue, he observed a 1989 four-door Honda with the same license plate *1027 number given to him by the dispatcher. The vehicle was stopped by the side of the road, with its headlights on and engine running. The male occupant was speaking loudly on a cell phone.
Horton activated the emergency flashers on his patrol car and pulled up behind the vehicle.[3] As he approached the driver, he detected a strong odor of alcohol. When he got to the driver's side front window, he observed that the driver's eyes were bloodshot and his speech slurred. Horton asked the driver where he was coming from, and the driver told him that he had been drinking at a pub in Bloomfield.
Horton instructed the driver to get out of his car, after which he administered field-sobriety tests. Based upon the results of those tests, the driver, who was identified as Adubato, was arrested and charged with DWI, along with other offenses not relevant to this appeal.
At the time of the arrest, Adubato was parked in front of his residence on Belmont Avenue. However, Horton testified that he was not aware of that fact at the time, because he had not yet performed a record check on the vehicle.
Adubato filed a motion to suppress the evidence resulting from Horton's "stop" of his vehicle, alleging that Horton lacked probable cause to make the stop and administer field-sobriety tests. The municipal court judge held an evidentiary hearing on April 28, 2009, at which Horton was the only witness. In a written decision dated May 1, 2009, the judge determined that Horton acted with probable cause and denied the motion.[4]
On July 23, 2009, Adubato entered a conditional plea of guilty to the DWI charge. He was sentenced, as a first offender, to a seven-month suspension of his driving privileges and required to attend twelve hours of a program for intoxicated drivers, in addition to the required fines and penalties. The sentence was stayed pending Adubato's appeal to the Law Division.
The Law Division judge heard the appeal on January 29, 2010. In an oral decision, he denied the motion to suppress de novo. He concluded that, because there was testimony that the driver was "getting in and out of his vehicle," there was "some risk that the residential neighborhood [was] being cased for targets," which gave "the police officer the right to inquire." Citing State v. Martinez, 260 N.J.Super. 75, 615 A.2d 279 (App.Div. 1992), the judge concluded that Horton had a "common-law right to inquire based upon a founded suspicion that criminal activity might be afoot." The judge accepted the conditional plea, and imposed the same sentence as had been imposed by the municipal judge. He stayed the sentence pending Adubato's appeal to us, which was timely filed.

II.
On appeal, Adubato raises the following issue:

*1028 THE MOTOR VEHICLE STOP AND SEIZURE OF THE DEFENDANT WAS UNLAWFUL.
Our role in an appeal such as this one is limited, in that we "consider only the action of the Law Division and not that of the municipal court." State v. Oliveri, 336 N.J.Super. 244, 251, 764 A.2d 489 (App.Div.2001) (citing State v. Joas, 34 N.J. 179, 184, 168 A.2d 27 (1961)). The Law Division determination is de novo on the record from the municipal court, Rule 3:23-8(a), but the Law Division judge must give "due, although not necessarily controlling, regard to the opportunity of the magistrate to judge the credibility of the witnesses." State v. Johnson, 42 N.J. 146, 157, 199 A.2d 809 (1964). In this case, the municipal judge made no specific credibility findings, although we note that the truthfulness of Horton's testimony has not been challenged on appeal.
We are ordinarily limited to determining whether the Law Division's de novo findings "could reasonably have been reached on sufficient credible evidence present in the record." Id. at 162, 199 A.2d 809. Nevertheless, our review of purely legal issues is plenary. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995); State v. Goodman, 415 N.J.Super. 210, 225, 1 A.3d 767 (App.Div.2010), certif. denied, 205 N.J. 78, 12 A.3d 210 (2011). Finally, because an appeal is taken from a trial court's ruling rather than reasons for the ruling, we may rely on grounds other than those upon which the trial court relied. See State v. Maples, 346 N.J.Super. 408, 417, 788 A.2d 314 (App.Div.2002); State v. Deluca, 325 N.J.Super. 376, 389, 739 A.2d 455 (App.Div.1999), aff'd as modified, 168 N.J. 626, 775 A.2d 1284 (2001).
Under the Fourth Amendment of the United States Constitution and Article 1, paragraph 7 of the New Jersey Constitution, "[a] warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement." State v. Cooke, 163 N.J. 657, 664, 751 A.2d 92 (2000); see also State v. Alston, 88 N.J. 211, 230, 440 A.2d 1311 (1981). The same is true of the warrantless seizure of a person or property. Terry v. Ohio, 392 U.S. 1, 19-21, 88 S.Ct. 1868, 1879-80, 20 L.Ed.2d 889, 905-06 (1968) (seizure of a person); State v. Hempele, 120 N.J. 182, 218-19, 576 A.2d 793 (1990) (seizure of property).
The seizure of a person occurs in a police encounter if the facts objectively indicate that "`the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" State v. Tucker, 136 N.J. 158, 166, 642 A.2d 401 (1994) (quoting Florida v. Bostick, 501 U.S. 429, 439, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389, 402 (1991)). In applying that test, our courts implement the constitutional guarantee to protect the "reasonable expectations of citizens to be `secure in their persons, houses, papers and effects.'" Id. at 165, 642 A.2d 401 (quoting N.J. Const. art. I, ¶ 7).
In State v. Pineiro, 181 N.J. 13, 20, 853 A.2d 887 (2004), the Supreme Court defined a field inquiry as "the least intrusive encounter," occurring when a police officer approaches a person and asks if he or she is willing to answer some questions. "A field inquiry is permissible so long as the questions `[are] not harassing, overbearing, or accusatory in nature.'" Ibid. (quoting State v. Nishina, 175 N.J. 502, 510, 816 A.2d 153 (2003)). During such a field inquiry, "the individual approached `need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.'" State v. Privott, 203 N.J. 16, 24, *1029 999 A.2d 415 (2010) (quoting State v. Maryland, 167 N.J. 471, 483, 771 A.2d 1220 (2001)).
An investigatory stop, unlike a field inquiry, is characterized by a detention in which the person approached by a police officer would not reasonably feel free to leave, even though the encounter falls short of a formal arrest. State v. Stovall, 170 N.J. 346, 355-56, 788 A.2d 746 (2002); see also Terry, supra, 392 U.S. at 19, 88 S.Ct. at 1878-79, 20 L.Ed.2d at 904.
The Terry exception to the warrant requirement permits a police officer to detain an individual for a brief period, and to pat him down for the officer's safety, if that stop is "based on `specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Rodriguez, 172 N.J. 117, 126, 796 A.2d 857 (2002) (quoting Terry, supra, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906). See also, Privott, supra, 203 N.J. at 25, 999 A.2d 415 (describing the Terry stop and the limited nature of the pat down for weapons). Under this well-established standard, "[a]n investigatory stop is valid only if the officer has a `particularized suspicion' based upon an objective observation that the person stopped has been [engaged] or is about to engage in criminal wrongdoing." State v. Davis, 104 N.J. 490, 504, 517 A.2d 859 (1986).
"To determine whether the State has shown a valid investigative detention requires a consideration of the totality of the circumstances." State v. Elders, 192 N.J. 224, 247, 927 A.2d 1250 (2007); see also Privott, supra, 203 N.J. at 25-26, 999 A.2d 415. As the Supreme Court observed in Davis, supra, 104 N.J. at 505, 517 A.2d 859,
Such encounters are justified only if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur. No mathematical formula exists for deciding whether the totality of circumstances provided the officer with an articulable or particularized suspicion that the individual in question was involved in criminal activity. Such a determination can be made only through a sensitive appraisal of the circumstances in each case.
In evaluating the "totality of the circumstances," we "are to give weight to `the officer's knowledge and experience' as well as `rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise.'" State v. Citarella, 154 N.J. 272, 279, 712 A.2d 1096 (1998) (quoting State v. Arthur, 149 N.J. 1, 10-11, 691 A.2d 808 (1997)). "The fact that purely innocent connotations can be ascribed to a person's actions does not mean that an officer cannot base a finding of reasonable suspicion on those actions as long as `a reasonable person would find the actions are consistent with guilt.'" Id. at 279-80, 712 A.2d 1096 (quoting Arthur, supra, 149 N.J. at 11, 691 A.2d 808).
The Law Division judge relied on the following language in our opinion in Martinez, 260 N.J.Super. at 78, 615 A.2d 279 (citations omitted).
We take notice, however, that operation of a motor vehicle in the middle of the night on a residential street at a snail's pace between five and ten m.p.h. is indeed "abnormal," as the Trooper testified. Such abnormal conduct suggests a number of objectively reasonable concerns: (a) something might be wrong *1030 with the car; (b) something might be wrong with its driver; (c) a traffic safety hazard is presented to drivers approaching from the rear when an abnormally slow moving vehicle is operated at night on a roadway without flashers; (d) there is some risk that the residential neighborhood is being "cased" for targets of opportunity. Possibilities (a), (b) and (c) involve the "community caretaking function" expected of alert police officers. Possibility (d) implicates the "common-law right to inquire" based upon a founded suspicion that criminal activity might be afoot. It is appropriate to consider all of these applicable concerns and balance them against the minimal intrusion involved in a simple inquiry stop.
The "community caretaking" doctrine, which was implicated in the first three "possibilities" mentioned in Martinez, "applies when the `police are engaged in functions, [which are] totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a [criminal] statute.'" State v. Diloreto, 180 N.J. 264, 275, 850 A.2d 1226 (2004) (quoting State v. Cassidy, 179 N.J. 150, 161 n. 4, 843 A.2d 1132 (2004)). However, we view the "common-law right to inquire," to the extent it is not part of "community caretaking," as a precursor of a "field inquiry," as articulated in Pineiro, 181 N.J. at 20, 853 A.2d 887.

III.
With these principles in mind, we examine the facts of this case and consider whether, under the "totality of the circumstances," Horton's conduct violated Adubato's constitutional rights.
When he arrived at the vicinity of Adubato's car, Horton had been told by the dispatcher that the car had been observed "continually driving around the neighborhood" and that the driver kept "exiting the vehicle." He may have been told that the driver was "a possible intoxicated male." On arrival, Horton observed the car stopped on the side of the road, with the engine running, the lights on, and the driver speaking loudly on a cell phone. He did not know at the time that Adubato was parked in front of his own house.
Consequently, Horton did not know whether he was dealing with an intoxicated driver, a lost driver, someone with car trouble, or, as the Law Division judge suggested, someone who was looking around the neighborhood for opportunities to engage in criminal conduct. Under those circumstances, we conclude that Horton was justified in making further inquiry, whether one views the situation as governed by the search and seizure concepts articulated in Pineiro or the "community caretaking" concepts articulated in Martinez.
The question then becomes whether the fact that Horton had his flashers on when he pulled up behind Adubato's car transformed a Pineiro or Martinez field inquiry into a Terry stop. The answer to this question is important because it is clear that, at the time he observed Adubato stopped by the side of the road speaking on his cell phone, Horton did not have a factual basis for "a particularized suspicion" sufficient to warrant a Terry stop. The anonymous call did not supply a sufficient basis for a Terry stop under the principles enunciated by the Supreme Court in State v. Golotta, 178 N.J. 205, 221-22, 837 A.2d 359 (2003).
We again look at the "totality of the circumstances." Horton did not, in actuality, stop Adubato's vehicle.[5] It was already *1031 parked by the side of the road, for reasons then unknown to Horton. The incident took place at night, after 10 p.m. While Horton could, of course, have pulled up behind Adubato without his flashers on, we are not willing to find that his decision to use his flashers when pulling up behind a stopped car late at night elevated his field inquiry into a Terry stop. We view the conduct as constitutionally ambiguous. The driver of such a car might be concerned that he or she was not free to drive away, Rodriguez, supra, 172 N.J. at 129, 796 A.2d 857 ("[A]s a practical matter, citizens almost never feel free to end an encounter initiated by the police"), but would also have been reassured that the person parking behind was a police officer rather than a stranger with potentially unfriendly intentions. The use of the flashing lights enhanced Horton and his partner's safety, as well as Adubato's. Finally, common experience suggests that police officers routinely use their flashers when rendering roadside assistance.
In addition, in State v. Goetaski, 209 N.J.Super. 362, 366, 507 A.2d 751 (App. Div.), certif. denied, 104 N.J. 458, 517 A.2d 443 (1986), we held that sufficiently unusual circumstances sounding in community-caretaking concepts can "warrant the closer scrutiny of a momentary investigative stop and inquiry." See also State v. Harris, 384 N.J.Super. 29, 45, 894 A.2d 8 (App.Div.), certif. denied, 188 N.J. 357, 907 A.2d 1016 (2006) ("Brief, non-intrusive encounters with individuals on the street or in parked cars implicate none of the privacy or security concerns engendered by discretionary police spot checks of moving vehicles.").
As Horton approached the driver's side window, he detected the odor of alcohol, which he determined was coming from Adubato's "breath." Horton also noted that Adubato's eyes were "bloodshot and watery," and that "his speech was also affected." When Horton asked Adubato where he was coming from, Adubato responded that he had been drinking at a pub in Bloomfield. At that point, Horton had the factual basis for an "articulable suspicion" that Adubato had engaged in criminal conduct, i.e., driving while intoxicated, sufficient to warrant a Terry stop, including the administration of field-sobriety tests.
In summary, when he arrived on the scene, Horton and his partner had a sufficient basis to make further inquiry under the concepts of both Pineiro (field inquiry) and Martinez (community caretaking). Horton's decision to turn his flashers on when he pulled behind Adubato's parked car did not, under the particular facts of this case, elevate that inquiry into a Terry stop. Once Horton ascertained that Adubato had the odor of alcohol on his breath, bloodshot and watery eyes, slurred speech, and that he had been drinking, he had a sufficient basis for a Terry stop. As a result, the Law Division's decision denying the motion to suppress was correct as a matter of law, although not for the exact reasons stated by the judge.
Affirmed.
NOTES
[1] Judge Carchman did not participate in oral argument. However, the parties consented to his participation in the decision.
[2] During cross-examination, Horton was asked whether the dispatch notes said anything about an intoxicated driver. He responded that they did not.
[3] During cross-examination, Horton was asked whether he "effectuated a motor vehicle stop" and he responded that he did.
[4] Although the municipal judge made findings of fact, some of them are not supported by the record. He found that there had been multiple calls to the dispatcher, but there was no mention of more than one call at the hearing. He also found that the callers stated that the driver was using a cell phone and speaking so loudly it could be heard in the adjacent houses, but there was no such testimony. Horton's testimony was that Adubato was speaking on the cell phone when his car was parked by the side of the road.
[5] We have noted that Horton agreed with defense counsel on cross-examination that he made a "stop," but we are not bound by Horton's view of the legal effects of his actions, one way or the other.