**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2026-18T1

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

    v.

SHANDALE GRADY and
DEMETRIUS MCCUTCHEN,

    Defendant-Respondents.

_____

Argued May 8, 2019 – Decided June 24, 2019

Before Judges Koblitz, Currier, and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 18-04-0346.

Robert John Wisse, Assistant Prosecutor, argued the cause for appellant (Camelia M. Valdes, Passaic County Prosecutor, attorney; Robert John Wisse, of counsel and on the brief).

Douglas R. Helman, Assistant Deputy Public Defender, argued the cause for respondent Shandale Grady (Joseph E. Krakora, Public Defender, attorney; Douglas R. Helman, of counsel and on the brief).

Richard Sparaco, Designated Counsel, argued the cause for respondent Demetrius McCutchen (Joseph E. Krakora, Public Defender, attorney; Richard Sparaco, on the brief).

PER CURIAM

The State appeals, after leave granted, from a November 28, 2018 order suppressing evidence of heroin and a gun.  We affirm.

The Paterson Police received a confidential tip on January 8, 2018 that two individuals were selling drugs out of a parked black Cadillac DeVille.  The informant, whom the police considered reliable, gave no specific information about the dealers such as age, sex, race, or appearance, but provided the car's license plate number.  Four detectives drove to the area that evening in an unmarked truck equipped with sirens and lights at about 8:10 p.m.  They saw the black DeVille parked on the other side of the street, parallel to the curb.

The police truck pulled up in front of the DeVille, headlights to headlights, leaving at most a few feet between the vehicles' hoods.  The DeVille was parked legally on the side of the road; the police truck was facing the opposite direction, against traffic.  Detective Sal Judeh, sitting in the passenger's seat, did not recall if other cars were parked behind the DeVille.  All four detectives left the truck in "tactical vests" with the word "POLICE" on the front.  Judeh stood "probably about a foot" from the DeVille's hood.

2

Judeh approached the DeVille shining an LED flashlight into the car's windshield; he could see two individuals, one in the passenger's seat (later identified as defendant Shandale Grady) and one in the backseat (later identified as defendant Demetrius McCutchen). A nearby streetlamp, along with the police truck's headlights and Judeh's flashlight, lit the area well. Judeh testified that he saw the passenger in front "become alarmed in a nervous demeanor, moving around. At which time, [he] observed that individual . . . reach into his waistband and retrieve a firearm." The detective kept his flashlight trained on Grady while quickly drawing his handgun with his other hand. Judeh ordered Grady to put down the gun: "Let me see your hands. Put it down. Put it down. At that moment, it was -- it was very quick, but I observed him putting that handgun into the hand rest." Grady was arrested. The police found five bricks[1] of heroin on the driver's seat and a handgun in the center console.

Both defendants were indicted for three third-degree controlled dangerous substance offenses (possession, N.J.S.A. 2C:35-10(a)(1); possession with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(3); and possession with intent to distribute within 1000 feet of a school, N.J.S.A. 2C:35-7 and N.J.S.A. 2C:35-5(a)), and Grady was indicted for additional charges of first- and second-degree

---

[1] "A brick of heroin is fifty bags." State v. Dorn, 233 N.J. 81, 86 n.1 (2018).

unlawful possession of a handgun N.J.S.A. 2C:39-5(j) and N.J.S.A. 2C:39-5(b)(1); second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1); second-degree possession of a handgun while committing a drug offense, N.J.S.A. 2C:39-4.1(a); and third-degree receiving the stolen gun, N.J.S.A. 2C:20-7 and N.J.S.A. 2C:20-2(b)(2)(b).

Detective Judeh was the sole witness at the suppression hearing on August 9, 2018. The State asserted that the officers seized the heroin and gun upon seeing them in plain view. The defense challenged Judeh's credibility. The trial court denied the motion to suppress, finding Judeh credible and concluding the police had probable cause to search the car and lawfully seized the heroin and gun.

After moving for reconsideration, defendants, now represented by new counsel, made a different argument -- that the police, by parking in front of the DeVille and exiting together, executed an investigative detention, not a mere field inquiry. Without articulable reasonable suspicion, the stop was unlawful and the gun and heroin that the police found as a result were therefore inadmissible. The State countered that the encounter began as a field inquiry, which requires no reasonable suspicion, and escalated into an investigative stop only after Grady pulled out a gun, when Judeh drew his weapon.

A-2026-18T1

The trial court reconsidered, granting defendants' motion to suppress. Reiterating that it found Judeh credible, the court nonetheless concluded that the police, upon arriving at the scene and before seeing Grady retrieve his weapon, began an investigative detention and not a field inquiry. The court found defendants reasonably believed they were not free to leave based on the totality of circumstances. The single most salient factor that influenced its conclusion was "the manner in which the police arrived on the scene and parked their vehicle." It found the detectives pulled up and parked in front of the DeVille, headlight to headlight, at an angle: "Not behind the vehicle. Not side by side. But on an angle . . . in front of the defendant's car." After finding the police conducted an investigative, or Terry,[2] stop, the court noted that the confidential tip did not provide reasonable and articulable suspicion to conduct a Terry stop.

The State then informed the court that no evidence existed to support the court's assumption that the police truck parked at an angle. The court responded that its decision did not rest on that one assumption because with the truck parked "head to head," defendants would not have felt free to leave.

---

[2] Terry v. Ohio, 392 U.S. 1 (1968).

A-2026-18T1

On appeal, the State argues that until the police caught sight of Grady's handgun, their conduct did not rise above a field inquiry. Once Grady picked up his gun, they commenced a Terry stop with articulable and reasonable suspicion, rendering their discovery of the gun and drugs lawful. The State does not dispute that the tip was insufficient; the officers lacked articulable and reasonable suspicion until they witnessed Grady retrieve his weapon.

In reviewing a decision on a motion to suppress, "we defer to the fact findings of the trial court, provided they are supported by substantial credible evidence in the record, State v. Davila, 203 N.J. 97, 109 (2010), but review the trial and remand courts' legal conclusions de novo, State v. Vargas, 213 N.J. 301, 327 (2013)." State v. Shaw, ___ N.J. ___, ___ (2019) (slip op. at 17-18).

"Not all police-citizen encounters constitute searches or seizures for purposes of the warrant requirement." State v. Rodriguez, 172 N.J. 117, 125 (2002). Besides an arrest, police encounters fall into one of two categories -- the field inquiry or the more intrusive investigative detention, or Terry stop. State v. Rosario, 229 N.J. 263, 271 (2017). While a Terry stop requires a "reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in, criminal activity," a field inquiry does not constitute a seizure and so requires no reasonable basis at all. Rosario, 229 N.J.

A-2026-18T1

at 272 (quoting State v. Stovall, 170 N.J. 346, 356 (2002)).  Only if a court finds that a Terry stop occurred must it proceed to determine whether "reasonable and particularized suspicion" justified the stop.  See ibid. (quoting Stovall, 170 N.J. at 356).

What distinguishes a Terry stop from a field inquiry is the extent to which the civilian objectively feels free to end the encounter.  Id. at 273.  A field inquiry is "a voluntary encounter between the police and a member of the public in which the police ask questions and do not compel an individual to answer," where the individual "reasonably believe[s] he [can] walk away without answering any of [the officer's] questions." Id. at 271-72 (third alteration in original) (quoting State v. Maryland, 167 N.J. 471, 483 (2001)).  Importantly, the individual's perception of the encounter, not the officer's, controls. Maryland, 167 N.J. at 483.

A Terry stop, by contrast, occurs when the individual objectively feels "that his or her right to move has been restricted."  Rodriguez, 172 N.J. at 126. That feeling of restriction renders a Terry stop "a temporary seizure."  Rosario, 229 N.J. at 272.  Each case requires a fact-sensitive analysis employing both the case law and "ordinary notions of how a reasonable person responds to a demonstration of police authority."  Rosario, 229 N.J. at 273 (looking to "typical

7

human experience" to determine if "one who is ordered to produce identification in such circumstances would feel free to leave").

While civilians rarely feel at liberty to ignore a police officer's questions, Rodriguez, 172 N.J. at 129, let alone drive off after an officer approaches one's car, one need not comply with an officer's request when the officer does not, expressly or by conduct, "communicate demands for directed behavior," Rosario, 229 N.J. at 275. A person must cooperate when law enforcement, "with words and deeds," directs a display of authority communicating a demand; that show of authority "should result in a person's staying put and engaging with the officer who has exhibited such a pointed intention to interact with that person." Id. at 274-75; accord United States v. Mendenhall, 446 U.S. 544, 553 (1980) ("[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained") (emphasis added). The law expects civilians to comply with such demands "and to raise constitutional objections thereafter." Rosario, 229 N.J. at 275.

Even without making verbal demands, actions may signal a demand for cooperation. For example, an officer may compel cooperation by blocking an individual's path with a patrol car. State v. Davis, 104 N.J. 490, 498 (1986). A person sitting in a parked car outside her home who "suddenly finds herself

blocked in by a marked patrol car that shines a flood light into the vehicle" and sees an officer exit and walk directly toward her vehicle "would not reasonably feel free to leave." Rosario, 229 N.J. 273. Displaying a firearm may also signal an intent to detain or compel cooperation, as does "the threatening presence of several officers." Mendenhall, 446 U.S. at 554.

By contrast, simply approaching a parked vehicle without blocking its path does not communicate a demand of compliance where the officer's questions amount to "a garden-variety, non-intrusive, conversational interaction . . . ." Rosario, 229 N.J. 274. Even activating a police car's "flashers" when stopping behind a parked car does not necessarily communicate a direct demand to "stay put," because it is common practice for police to put on their flashing lights when rendering roadside assistance. State v. Adubato, 420 N.J. Super. 167, 180-81 (App. Div. 2011).

Here, the trial court correctly found the four officers conducted a Terry stop because upon parking on the wrong side of the road, exiting their truck, and advancing towards the car in tactical gear with weapons, they communicated a demand that the car's occupants remain and answer their questions. That the officers exited immediately after pulling up in a truck equipped with sirens and shining lights on the well-lit street corner, parking close to the front of the

DeVille facing the opposite direction, only amplified this message. Whether they parked at a slight angle in front of the DeVille or not, the officers communicated "a pointed intention to interact with" the people in the car by pulling up, headlight to headlight, and exiting and approaching together in tactical vests. See Rosario, 229 N.J. at 274. The officers would not have descended with such a show of force upon a non-suspect to engage him or her in "casual," voluntary conversation. See ibid.

These circumstances differ from the flashing lights in Adubato, which did not constitute a show of authority because police commonly activate their flashers even when stopping to provide road-side assistance. 420 N.J. Super. at 181. Further, the State adduced no evidence that it reasonably suspected a threat to officer safety. See Rodriguez, 172 N.J. 128 ("The record contains no basis to conclude that a concern for officer safety justified the movement of defendant . . . ."). The critical question is not whether each aspect of the encounter signaled, on its own, an intent to detain, but whether the whole picture communicated that intent.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION