**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3501-18T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SHELDON M. GOLDSBOROUGH,
a/k/a SHELDON GOLDSBORO,
MIKEY GOLDSBORO, MICHAEL,
and MICKEY,

    Defendant-Appellant.

_____

Submitted January 23, 2020 - Decided February 12, 2020

Before Judges Fuentes, Mayer and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-11-1056.

Lauren A. Wimmer, attorney for appellant.

Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Andre R. Araujo, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from an April 5, 2019 judgment of conviction based on a guilty plea, focusing on a September 14, 2018 order denying his motion to suppress evidence. We affirm but for reasons other than those expressed by the judge.[1]

On November 29, 2017, defendant was charged in a multi-count indictment with offenses associated with possession of heroin, including the first-degree offense of maintaining or operating a facility for the production of heroin, possession of weapons, and endangering the welfare of a child.

On December 16, 2017, defendant filed a motion to suppress evidence discovered at the time of his arrest. The trial court conducted an evidentiary hearing on defendant's motion on the following dates: March 27, 2018; April 3, 2018; April 20, 2018; July 6, 2018; and August 6, 2018. In a September 14, 2018 order and written decision, the judge denied defendant's motion to suppress.

On February 25, 2019, defendant entered into a negotiated agreement with the State wherein he pleaded guilty to second-degree conspiracy to manufacture, distribute, or possess heroin with intent to distribute, N.J.S.A. 2C:5-2(a)(1), and

---

[1] "[B]ecause an appeal is taken from a trial court's ruling rather than reasons for the ruling, we may rely on grounds other than those upon which the trial court relied." State v. Adubato, 420 N.J. Super. 167, 176 (App. Div. 2011).

second-degree possession of a firearm while committing a CDS offense, N.J.S.A. 2C:39-4.1(a). In exchange, the prosecutor agreed to recommend the court sentence defendant to an aggregate ten-year term of imprisonment, with fifty-two months of parole ineligibility.[2] On April 5, 2019, the judge sentenced defendant in accordance with the terms of the plea agreement.

At the suppression hearing, Detective Brian Cole testified on behalf of the State. The following witnesses testified on behalf of defendant: Natrice Tilghman, defendant's children, and Detective Charles Mackafee. The following facts were adduced during the suppression hearing.

On August 31, 2017, law enforcement officers executed an arrest warrant for defendant. Detective Cole was assigned to the U.S. Marshals Fugitive Task Force and personally participated in the execution of the arrest warrant. The warrant sought defendant's arrest for charges stemming from a double homicide.

Before executing the warrant, law enforcement officials discussed an arrest plan. The police were familiar with defendant based on previous contacts and knew he resided with Natrice Tilghman, his longtime girlfriend, and his children at his home in Vineland. Detective Cole testified defendant "was

---

[2] The second-degree possession of a firearm offense is subject to the mandatory parole ineligibility provisions of the Graves Act, N.J.S.A. 2C:43-6c.

involved in narcotics distribution and manufacturing, assaults, [and] weapons offenses." Based on defendant's criminal history, including weapons possession, fourteen officers were assigned to execute the arrest warrant.

Defendant's home was a "split level," having stairs leading up to the main level and stairs leading down to the basement. Upon entering the front door, there was an interior landing allowing a person to see the ascending and descending stairs in defendant's home.

When approaching defendant's home to execute the arrest warrant, Detective Cole observed multiple cars parked outside. The number of cars indicated to Detective Cole that several people may be inside the home at the time. In executing the warrant, law enforcement approached the front door armed and arrayed in a five-person line. The first person in the line held a protective shield. Detective Cole, the third person in the line, knocked on the door and identified the group as police officers. The officers wore plain clothing with tactical gear identifying them as law enforcement personnel.

After knocking several times, Michael Loftin answered the door. As soon as the door opened, the officers observed the ascending staircase to the right of the landing and the descending staircase to the left of the landing. Loftin did not cooperate with law enforcement. Not only did he refuse to tell the officers

4

if defendant was present, Loftin would not state if there were other people inside the home. The officers removed Loftin from the home and handcuffed him. Loftin, who was not arrested, was detained for the safety of the officers executing defendant's arrest warrant.

According to Detective Cole, while standing outside the home, he yelled for defendant to exit the house. There was no response. Shortly thereafter, several other individuals exited the home. The exiting people refused to tell the police officers if defendant, or anyone else, remained inside the house.

The officers, still positioned outside the front door, continued to yell for defendant, and any other persons present, to exit the building. Several minutes later, defendant walked from the upper staircase to the front door. He was arrested at the front doorway, handcuffed, and seated on the steps immediately outside the front door.

At this point, the officers asked defendant if anyone else was inside the home. Because defendant did not respond, the officers continued to call out to determine if there were other people inside. With the front door open, the officers heard "crying coming from the basement." The officer in charge of the operation then authorized a protective sweep of the house. One group of officers went to the right and walked upstairs, and another group of officers went to the

5

left and walked downstairs. According to Detective Cole, the purpose of the sweep was to ensure there was no one injured inside the home and there were no additional persons in the house who could pose a threat to the officers.

Detective Cole was in the group of officers who went to the basement area of the home. The officers opened the door to a basement bedroom and found two young girls crying.[3] An officer escorted the girls outside the home.

Detective Cole's group continued their protective sweep of the basement area, which was dark and unfinished. It was in the unfinished area of the basement that the officers saw a plastic straw, spoon, and a credit card. These items were covered in a white powder. The officers also saw a container of Inositol, commonly used to cut CDS, and plastic baggies, often associated with packaging of illicit drugs. The officers also found two ballistic vests in the laundry room adjacent to the area where the other items were found.

The officers reported their observations in the basement to the lead investigator, Detective Mackafee. Detective Mackafee entered the basement and confirmed the presence of the items observed by Detective Cole and his team. Detective Mackafee decided to obtain a search warrant to search

---

[3] The children in the basement bedroom were defendant's eleven year old twin daughters.

defendant's entire house. After obtaining a search warrant, officers found multiple weapons and ammunition inside the house and in a detached shed. They also found drug manufacturing equipment and paraphernalia.

The main defense witness, defendant's girlfriend, testified during the suppression hearing and offered a different version of the events. According to defendant's girlfriend, she repeatedly told the officers that her twin daughters were in the basement bedroom. Other than her children, defendant's girlfriend stated she told the officers at least six times that there was no one else in the house. She also testified that she removed the children from the basement with no involvement from the police.

At the conclusion of the testimony, the judge denied defendant's suppression motion, finding the testimony of Detective Cole credible and the protective sweep was "limited in duration, cursory in nature and confined to areas where potential threats to the safety of officers on scene might be located." The judge determined the protective sweep of defendant's home, incident to defendant's lawful arrest, was valid to protect the safety of the police officers and others.

The judge further concluded the items observed during the protective sweep were in plain view and immediately apparent to be evidence of a crime

7

or contraband, constituting another exception to the warrant requirement. According to the judge, the police were lawfully in the basement area because the officers heard crying coming from that section of the house.

On appeal, defendant raises the following arguments:

POINT I

THE COURT COMMITTED AN ERROR OF LAW IN DENYING DEFENDANT'S MOTION TO SUPPRESS THE EVIDENCE RECOVERED INCIDENT TO HIS ARREST BECAUSE THE PROTECTIVE SWEEP IN THIS CASE WAS NOTHING MORE THAN AN UNCONSTITUTIONAL WARRANTLESS SEARCH.

A. Officers did not restrict their sweep to the spaces immediately adjoining the place of arrest from which an attack might be launched and lacked a reasonable articulable suspicion that the area to be swept could be harboring an individual posing danger.

B. Officers created the danger that became the basis for the protective sweep.

POINT II

THE EVIDENCE OBTAINED FROM THE DEFENDANT'S RESIDENCE WAS REQUIRED TO BE SUPPRESSED AS "FRUIT OF THE POISONOUS TREE."

POINT III

THE EMERGENCY AID EXCEPTION IS NOT A JUSTIFICATION FOR THE WARRANTLESS

ENTRY AND SWEEP OF THE DEFENDANT'S RESIDENCE.

Our review of a trial court's denial of a motion to suppress is limited. State v. Handy, 206 N.J. 39, 44-45 (2011). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Rockford, 213 N.J. 424, 440 (2013) (alteration in original) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)). Further, "[a]n appellate court 'should give deference to those findings of the trial judge which are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). However, issues of law are reviewed de novo. State v. Gandhi, 201 N.J. 161, 176 (2010).

"Both the United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against unreasonable searches or seizures." State v. Minitee, 210 N.J. 307, 318 (2012). Searches and seizures conducted without a warrant, "particularly in a home, are presumptively unreasonable." State v. Edmonds, 211 N.J. 117, 129 (2012) (quoting State v. Bolte, 115 N.J. 579, 585 (1989)). The State has the burden of proving by a

preponderance of the evidence that such searches and seizures are "justified by one of the 'well-delineated exceptions' to the warrant requirement." State v. Shaw, 213 N.J. 398, 409 (2012) (quoting State v. Frankel, 179 N.J. 586, 598 (2004)).

An arrest warrant provides officers "limited authority to enter a dwelling in which the suspect lives" to make the arrest. State v. Cleveland, 371 N.J. Super. 286, 294 (App. Div. 2004) (quoting Payton v. New York, 445 U.S. 573, 603 (1980)). Police "have the right to execute an arrest warrant on a defendant at his or her home, and they may enter the home to search for the defendant when there is probable cause to believe that he or she is there." State v. Jones, 143 N.J. 4, 13 (1995). In accordance with Rule 3:3-3(c), an arrest warrant is deemed executed upon the arrest of the suspect.

The protective-sweep doctrine, one of the recognized exceptions to the search warrant requirement, permits "a quick and limited search of [the] premises, incident to an arrest and conducted to protect the safety of police officers or others." State v. Cope, 224 N.J. 530, 546 (2016). A protective sweep "is narrowly confined to a cursory visual inspection of those places in which a person may be hiding." State v. Davila, 203 N.J. 97, 113 (2010). "A protective sweep may only occur when (1) police officers are lawfully within private

10

premises for a legitimate purpose, which may include consent to enter; and (2) the officers on the scene have a reasonable articulable suspicion that the area to be swept harbors an individual posing a danger." Id. at 102. Caution must be taken to avoid invoking the protective sweep doctrine to justify an unconstitutional warrantless search.

Defendant argued the officers unlawfully conducted a protective sweep and therefore any contraband discovered must be suppressed. We agree that the facts adduced by the judge based on the testimony and evidence at the suppression hearing do not support the protective sweep exclusion to the search warrant requirement.

Here, law enforcement was not lawfully within defendant's home when they heard crying inside the residence. Defendant was arrested outside the residence and remained outside his home while the officers waited for a vehicle to take him to the police station. Law enforcement lost any lawful status on defendant's property after defendant was arrested, handcuffed, and seated on the front steps outside his home. Simply because law enforcement remained on the front steps of the home waiting for an appropriate transport vehicle did not justify the protective sweep exception to the search warrant requirement.

A-3501-18T2

However, based on the facts established during the suppression hearing, the officers' entry into defendant's home was valid under the State's alternative argument in opposition to defendant's motion to suppress. The State argued the emergency-aid exception to the search warrant requirement was satisfied when the officers heard crying coming from the basement of the home. Because the judge determined the protective sweep doctrine justified the warrantless entry and search of defendant's home, the judge did not address the State's alternative argument.

When exigent circumstances are present, "[p]olice officers serving in a community-caretaking role are empowered to make a warrantless entry into a home under the emergency-aid exception to the warrant requirement." State v. Vargas, 213 N.J. 301, 323 (2013). The emergency-aid doctrine "is derived from the commonsense understanding that exigent circumstances may require public safety officials, such as the police, . . . to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury." State v. Hathaway, 222 N.J. 453, 469 (2015) (emphasis omitted) (quoting Frankel, 179 N.J. at 598). Under the emergency-aid exception, the State must show "(1) the officer had an objectively reasonable basis to believe that an emergency require[d] that he [or she] provide immediate assistance to protect or preserve

life, or to prevent serious injury and (2) there was a reasonable nexus between the emergency and the area or places to be searched.'" Id. at 470 (first alteration in original) (quoting Edmonds, 211 N.J. at 132).

"The emergency-aid doctrine, particularly when applied to the entry of a home, must be 'limited to the reasons and objectives that prompted' the need for immediate action." Edmonds, 211 N.J. at 134 (quoting Frankel, 179 N.J. at 599). "If, however, contraband is 'observed in plain view by a public safety official who is lawfully on the premises and is not exceeding the scope of the search,' that evidence will be admissible." Hathaway, 222 N.J. at 470 (quoting Frankel, 179 N.J. at 599-600).

Here, Detective Cole heard crying coming from the basement of defendant's home as the detective waited for defendant to be transported to the police station. Based on the crying sound, the officers had "an objectively reasonable basis to believe that an emergency require[d] . . . immediate assistance." Edmonds, 211 N.J. at 132. Detective Cole testified he had "an obligation to verify . . . why the crying's occurring." The officers were unsure whether the crying was from someone who was injured or simply indicative of another person inside defendant's house. According to Detective Cole, based on defendant's known criminal history and convictions for weapons offenses, it was

possible the crying sound came from an injured person present in the home who required immediate emergency assistance.

Moreover, there was a nexus between the perceived emergency based on the crying sounds and the places searched in the basement. Once the officers located the two girls in the basement bedroom, the officers had a reasonable suspicion that there may have been other individuals in the basement who needed emergency aid. Except defendant's girlfriend, whose testimony the judge did not find credible, the people who exited the house refused to tell the officers whether any other individuals remained in the home. Without that information, it was possible there were additional people in the basement who cried out, compelling the officers to enter the home under the emergency-aid doctrine.

Upon entering defendant's home under the emergency-aid exception to the warrant requirement, the officers discovered facially illicit narcotics and related paraphernalia in plain view in the basement of defendant's home. To apply the plain view exception, the State must demonstrate the following: "(1) the officer [was] lawfully in the viewing area when making the observation" and (2) it was

immediately apparent that the items were evidence of a crime, contraband, or otherwise subject to seizure. State v. Gonzales, 227 N.J. 77, 91 (2016).[4]

Because law enforcement discovered the evidence in plain view while performing a valid search under the emergency-aid exception, denial of defendant's motion to suppress the seized evidence was proper.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] According to the record, after defendant exited the house, he was taken into custody, searched, and handcuffed. The officers did not transport defendant to police headquarters after his arrest, indicating a need to wait for a "transport vehicle." There is no evidence in the record explaining the reason for this procedure. However, under these circumstances, this decision is not legally consequential. As our Supreme Court made clear in Gonzales, "[a]n objectively reasonable search or seizure is constitutional despite an officer's questionable motives[.]" Gonzales, 227 N.J. at 104 (emphasis added).