SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Donna M. Alessi (A-41/42-17) (079255)**

**Re-Argued October 7, 2019 -- Decided January 27, 2020**

**TIMPONE, J., writing for the Court.**

The Court considers whether the police may pull over a driver for questioning in furtherance of an investigation without reasonable suspicion that she committed a crime or traffic violation.

In 2011, defendant Donna Alessi began dating Philip Izzo, a construction official for Raritan Township who supervised the construction staff, including Mark Fornaciari. Fornaciari filed a whistleblower claim, naming Izzo as a defendant. In preparing his defense, Izzo took Fornaciari's personnel file and stored it in his truck. In 2013, the relationship between defendant and Izzo ended. One night in June 2013, Izzo went to a bar in Hillsborough Township. Defendant saw Izzo, went to the parking lot, entered his truck, and removed some of her personal items as well as the personnel file, which she mailed to Fornaciari. The package wound up at the construction office because of an issue with the address, and the police were called. They determined through post office surveillance footage that defendant had mailed the package.

Detective Benedict Donaruma made several attempts to contact defendant: he called and left voicemails, and he left his business card in her door. On another day, he knocked at defendant's door and, seeing a woman in her home, called out to her. He later testified that all of these methods of initiating contact generally lead to responses. On the day when Donaruma saw the woman in defendant's home, he waited to see if she would leave. After a couple of minutes, he spotted defendant's vehicle on a local road. Though Donaruma did not observe her commit a traffic violation, he pulled behind her in his marked patrol car and activated the overhead lights. When defendant stopped, he approached her car and said he wanted to discuss his investigation. Over the course of the questioning, Donaruma informed defendant multiple times that she was free to leave.

According to Donaruma, defendant initially denied involvement but then admitted she sent the package at the behest of her then-boyfriend Izzo in an effort to get Fornaciari and another person in trouble with the Township. Defendant conceded she and Izzo drafted the letter enclosed in the package together, and she intentionally listed the wrong return address so the package would end up with the Township.

1

Police arrested Izzo on charges of official misconduct and misapplication of entrusted property. Upon arrest, Izzo gave a statement claiming the personnel file had been stolen out of his truck at the bar. Defendant later gave another statement in the presence of her attorney, which was later played at her trial. In it, defendant indicated that, by the time she mailed the package, she was no longer dating Izzo. She asserted she had permission to enter Izzo's truck and remove her personal effects, and that she accidentally grabbed the personnel file. Upon realizing her mistake, she decided to send it back to Fornaciari to spite Izzo and help with the lawsuit.

Defendant was arrested and charged with false reporting, hindering apprehension, and burglary. She moved to suppress her roadside statement based on a violation of the Fifth Amendment. The court denied her motion and admitted the statement at trial. A jury found defendant guilty on all three counts.

The Appellate Division reversed her convictions, holding that the roadside stop was unconstitutional. Following a motion for reconsideration, the Appellate Division changed course as to the burglary conviction, determining that there was clear evidence that defendant entered Izzo's truck without permission and removed the personnel file.

Both sides sought certification. The Court granted defendant's petition, "limited to the issue of whether the burglary conviction also should have been reversed due to the admission of defendant's incriminating roadside statement, which influenced the jury's determination as to defendant's credibility." 232 N.J. 289 (2018). The Court also granted the State's cross-petition in full. 232 N.J. 293 (2018). Following oral argument, the Court retained jurisdiction but remanded the case, directing the trial "court to make a record and findings of fact and law on whether the officer's stop of defendant's vehicle was constitutional." ___ N.J.___ (2018). The judge concluded that "the stop and resultant seizure [were] unconstitutional."

**HELD:** The circumstances of this case do not legitimize the stop. Law enforcement must have reasonable and articulable suspicion of a traffic violation, the commission of a crime, or unlawful activity before executing a traffic stop. Accordingly, the roadside statement given by defendant during the unlawful stop should have been excluded at trial, and the Court affirms the Appellate Division's reversal of her convictions for hindering apprehension and false reporting. Because defendant's roadside statement permeated the trial, severely affecting her credibility and ability to mount a defense to the separate burglary charge, that conviction is reversed as well.

1. Courts evaluate the totality of the circumstances to determine whether an officer had a reasonable suspicion that justified an investigatory stop. The Court reviews cases in which it has determined the constitutionality of a stop where the officer's suspicion was not based on an observed traffic violation and notes that those decisions reveal a highly fact-intensive inquiry. (pp. 16-21)

2

2.  Based solely on the knowledge available to Donaruma at the time he pulled defendant over, he could not have reasonably suspected defendant participated in a crime. Donaruma testified on remand that defendant was not the target of his investigation or even a suspect at the time he stopped her.  Donaruma stopped defendant to develop his investigation into Izzo.  From an objective perspective, defendant's actions on the post office surveillance footage were not reasonably more consistent with guilt than innocence.  That defendant did not respond to the officers' calls or visits does not alter that conclusion; as the trial judge noted, there was no testimony that Donaruma became suspicious due to defendant's elusive behavior.  A law enforcement officer cannot use an automobile stop merely for the purpose of a police interview and without observing a traffic violation or having a reasonable suspicion of other criminal activity.  Because the stop in this case was unconstitutional, the Court does not address defendant's additional argument that the scope of the stop was unreasonable.  (pp. 21-26)

3.  Courts will not exclude evidence sufficiently attenuated from the taint of an unconstitutional stop.  The Court reviews the three factors in an attenuation analysis and determines defendant's statement to Donaruma was not so attenuated from the initial stop as to avoid application of the exclusionary rule.  Without that statement, defendant's convictions for false reporting and hindering apprehension cannot stand.  (pp. 26-29)

4.  Finally, the Court reviews the application of defendant's roadside statement to her burglary charge.  Defendant's guilt hinged on whether she had permission to enter Izzo's truck.  If the jury believed defendant's version of events over Izzo's, then it would not have found defendant guilty of burglary.  Yet, this was unlikely in light of the State's exploitation of contradictions between defendant's roadside statement and the statement she gave later, with counsel present.  Additional facts in the record support defendant's claim that she had permission to enter the truck, and Izzo had his own credibility issues.  Had the trial court initially excluded defendant's roadside statement, defendant's credibility would have remained intact because the State would never have had the opportunity to highlight the falsehoods she told Donaruma.  The admission of the roadside statement was "clearly capable of producing an unjust result," R. 2:10-2, because there is reasonable doubt as to whether the jury would have found defendant guilty of burglary in its absence.  The Court does not pass judgment on the merits of whether defendant burgled Izzo's truck.  (pp. 29-34)

**The judgment of the Appellate Division reversing defendant's convictions of hindering apprehension and false reporting is AFFIRMED, defendant's conviction for burglary is REVERSED, and the matter is REMANDED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE'S opinion.**

SUPREME COURT OF NEW JERSEY

A-41/42 September Term 2017

079255

State of New Jersey,

Plaintiff-Appellant/
Cross-Respondent,

v.

Donna M. Alessi,

Defendant-Respondent/
Cross-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Remanded |
| --- | --- |
| November 7, 2018 | November 16, 2018 |

| Re-Argued | Decided |
| --- | --- |
| October 7, 2019 | January 27, 2020 |

Jeffrey L. Weinstein, Assistant Prosecutor, argued the
cause for appellant/cross-respondent (Michael J.
Williams, Acting Hunterdon County Prosecutor, attorney;
Jeffrey L. Weinstein, of counsel and on the briefs).

Lauren S. Michaels, Assistant Deputy Public Defender,
argued the cause for respondent/cross-appellant (Joseph
E. Krakora, Public Defender, attorney; Lauren S.
Michaels, of counsel and on the briefs, Elizabeth C. Jarit,
Assistant Deputy Public Defender, and Jaime B. Herrera,
Assistant Deputy Public Defender, on the briefs).

1

Jane C. Schuster, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, of counsel and on the briefs).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom, Liza Weisberg, Edward Barocas, and Jeanne LoCicero, on the brief).

JUSTICE TIMPONE delivered the opinion of the Court.

In this appeal, we determine whether the police may pull over a driver for questioning in furtherance of an investigation without reasonable suspicion that she committed a crime or traffic violation. We find the circumstances of this case do not legitimize the stop. Indeed, we reiterate that law enforcement must have reasonable and articulable suspicion of a traffic violation, the commission of a crime, or unlawful activity before executing a traffic stop.

Accordingly, we hold that the roadside statement given by defendant during the unlawful stop should have been excluded at trial, and we affirm the Appellate Division's reversal of her convictions for hindering apprehension and false reporting. We further conclude defendant's roadside statement permeated the trial, severely affecting her credibility and ability to mount a defense to the separate burglary charge. We reverse that conviction as well.

2

We remand the matter to the trial court for further proceedings consistent with this opinion.

I.

A.

We adduce the following facts from the trial record, suppression hearing, and remand hearing.

In 2011, defendant Donna Alessi began dating her married co-worker, Philip Izzo. Izzo was a construction official for Raritan Township responsible for supervising the construction staff, including an inspector, Mark Fornaciari. During that time, Fornaciari filed a whistleblower claim under New Jersey's Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -14, naming Izzo as a defendant. In preparing his defense, Izzo took documents from the Township's construction office, including Fornaciari's personnel file, and stored them in his truck. Izzo showed a synopsis of those materials to defendant and discussed the lawsuit with her.

In 2013, the relationship between defendant and Izzo ended. Their relationship soured to the extent that they asserted claims of harassing conduct against one another. One night in June 2013, Izzo parked his truck in the parking lot of a bar in Hillsborough Township and entered the bar. Defendant, who saw Izzo at the bar, went to the parking lot, entered Izzo's truck, and

3

removed some of her personal items as well as Fornaciari's personnel file. A surveillance camera at the bar captured defendant's actions that evening.

Defendant went to the Hillsborough Post Office to mail the personnel file to Fornaciari. She included an unsigned cover letter indicating she hoped the file would be of assistance in his lawsuit. She also warned Fornaciari that Izzo "has been planning to get rid of you for quite some time now," and he "got hold of the contractor he says you were inappropriate with to push that you are not a good employee." Initially, defendant attempted to mail this package without a return address, but a postal worker informed her that a return address was necessary. Defendant wrote the name and address of a Technical Assistant at the Township's construction office, Tina Stockelberg, on the return label.

Nevertheless, the package wound up "returned" to the construction office because of an issue with the mailing address. The Township Administrator, Allan Pietrefesa, determined that Stockelberg had not sent the package and that Fornaciari's personnel file may have been illegally removed from the construction office. Pietrefesa contacted the Raritan Township Police Department.

Detective Thomas Camporeale began an investigation into the removal of Fornaciari's personnel file. Pietrefesa told Camporeale that he had not

4

removed the file. He further informed Camporeale that the file was kept in a locked file in a locked office, which only Pietrefesa and Izzo could access. Camporeale contacted an officer at the Hunterdon County Prosecutor's Office and explained the circumstances surrounding the investigation. An assistant prosecutor relayed that charges of both official misconduct and misapplication of entrusted property might be brought "depending on what [the police] learned in the case and how this envelope left the building."

Based on the postage stamp, Camporeale knew the package had been mailed from the Hillsborough Post Office. At the post office, he reviewed the surveillance video. The footage showed a woman inscribing the return address, mailing the package, and getting into her car. He later learned from other employees at the construction office that Izzo had dated defendant. Additionally, Camporeale ran a Motor Vehicles Commission search to obtain a photograph of defendant. He compared it to the post office surveillance video and concluded that "it was the same person."

In advance of a planned vacation, Camporeale formally transferred the investigation to his colleague, Detective Benedict Donaruma. Camporeale "briefed him on everything to make sure that he was up-to-date." Donaruma viewed the surveillance footage and likewise concluded the woman in the video appeared "very similar" to defendant. Determined to learn why the

5

personnel file went missing and wound up in defendant's possession, Donaruma called defendant at least twice and left one or more unreturned voicemails. Donaruma would later testify that "for the most part . . . when we leave messages people do get back to us."

One of Donaruma's colleagues who lived in defendant's area drove past her home on two occasions in failed attempts to make contact with her. Detectives Camporeale and Donaruma determined the next step in their investigation was to visit defendant's home personally. They arrived at her condominium complex in an unmarked police car and knocked on the door, but no one answered and defendant's car was not present. Donaruma left his business card either "in the door in-between the screen door" or wedged in the home number on the front door. Again, Donaruma testified that, in his experience, this practice ordinarily led to a return call.

After several days passed without hearing from defendant, Donaruma decided to return to her home. Early on the morning of July 30, Donaruma ventured back to the condominium complex by himself because Camporeale had left for vacation. This time, he spotted defendant's car. He parked, walked up to the front door, and knocked multiple times "for about a minute or two." Although no one answered the door, he noticed a woman peer out from behind the curtain. Donaruma then identified himself by saying "police

6

department, need to speak to you," and knocked again. After another minute, he concluded no one would answer the door and returned to his car. As before, Donaruma testified that, in his experience, if someone was home when he knocked, that person typically answered the door.

Donaruma drove around the corner of defendant's complex and waited to see if the woman would leave. After a couple of minutes, he spotted defendant's vehicle on a local road within her development. Though Donaruma did not observe her commit a traffic violation, he pulled behind her in his marked patrol car and activated the overhead lights. When defendant stopped, Donaruma approached her car and said he wanted to discuss his investigation into the mailing of an envelope containing a missing personnel file. After questioning defendant for a few minutes by the side of the road, defendant asked to move to a more private location. Donaruma followed her to a nearby parking lot where the questioning continued for about an hour. Over the course of the questioning, Donaruma informed defendant multiple times that she was free to leave.

According to Donaruma, defendant initially denied involvement until he showed defendant an image of herself from the post office's surveillance footage. Defendant then admitted she sent the package at the behest of her then-boyfriend Izzo in an effort to get Fornaciari and Stockelberg in trouble

7

with the Township. Defendant explained how Izzo wanted to create the appearance that Stockelberg, who "had an alliance" with Fornaciari, stole the personnel file at Fornaciari's direction to help with his lawsuit. Defendant conceded she and Izzo drafted the letter together and she intentionally listed the wrong return address so the package would end up with the Township.

Eventually, defendant asked to leave for work. She agreed to meet Donaruma later that day at the police department. Donaruma arranged to have her picked up in a nearby parking lot and taken to the garage entrance at the police station because she did not want to be seen or have her car seen in the Township parking lot. At the police station, defendant initially gave a statement, then was advised of her <u>Miranda</u> rights, and invoked her right to counsel. This statement was not admitted at trial.

Using the information defendant provided during the roadside stop, police arrested Izzo on charges of second-degree official misconduct and third-degree misapplication of entrusted property. Upon arrest, Izzo gave a statement to police contradicting defendant's account. He claimed the personnel file had been stolen out of his truck at the bar. As a result, the police obtained and reviewed Izzo's and defendant's phone records, as well as the surveillance footage from the bar showing defendant entering Izzo's truck.

On October 2, defendant gave another statement in the presence of her attorney, which was later played at her trial. In it, defendant indicated that, by the time she mailed the package, she was no longer dating Izzo. She asserted she had permission to enter Izzo's truck and remove her personal effects, and that she accidentally grabbed the personnel file. Upon realizing her mistake, she decided to send it back to Fornaciari to spite Izzo and help with the lawsuit. She explained that Fornaciari's address was correct and that she intended for him to receive the envelope and cover note. She claimed she had no intention of involving Stockelberg and only provided her return address when prompted for an address by the employee at the post office.

B.

After police arrested defendant, a Hunterdon County grand jury returned an indictment charging her with fourth-degree false reporting, N.J.S.A. 2C:28-4(b)(1); third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(4); and third-degree burglary, N.J.S.A. 2C:18-2(a)(1).

Defendant filed a motion to suppress the contents of her roadside statement to Donaruma based on a violation of the Fifth Amendment. Defendant did not challenge the validity of the initial roadside stop under the Fourth Amendment. Because the trial judge determined defendant was not in

9

custody during the stop and the subsequent questioning, he denied her motion and admitted her roadside statement at trial.

After a five-day-long trial, a jury found defendant guilty on all three counts. The judge sentenced her to two years of probation and one hundred hours of community service.

Defendant appealed, challenging, in part, the initial stop. The Appellate Division reversed her convictions, remanding for a new trial. Defendant had not raised a Fourth Amendment challenge to the stop before the trial judge so the Appellate Division reviewed for plain error under Rule 2:10-2. As relevant here, the court held the roadside stop was unconstitutional because there were neither "particularized facts justifying the stop" nor "articulable and reasonable suspicion that [defendant] either committed a motor vehicle offense or was engaged in criminal activity."

Following a motion for reconsideration, the Appellate Division changed course as to the burglary conviction only. In the court's view, there was clear evidence that defendant entered Izzo's truck without permission, removed the personnel file, and mailed it to the Township.

Both sides sought certification from this Court. On February 9, 2018, we granted defendant's petition, "limited to the issue of whether the burglary conviction also should have been reversed due to the admission of defendant's

incriminating roadside statement, which influenced the jury's determination as to defendant's credibility." 232 N.J. 289 (2018). We also granted the State's cross-petition in full. 232 N.J. 293 (2018). We further granted the Office of the Attorney General's and the American Civil Liberties Union of New Jersey's motions for leave to appear as amici curiae.

Following oral argument, this Court "determined that a remand to the trial court [wa]s required for that court to make a record and findings of fact and law on whether the officer's stop of defendant's vehicle was constitutional under U.S. Const. amend. IV and N.J. Const. art. I, ¶ 7." ___ N.J.___ (2018). We ordered that, "among other things, the trial court should address whether, under the circumstances of this case, a police officer may stop a vehicle to question the driver when both the stop and the questioning are unrelated to any motor vehicle violation." Ibid. We retained jurisdiction over the matter to review the trial court's ultimate findings of fact and conclusions of law. Ibid.

## C.

On remand, the trial judge took testimony from Camporeale and Donaruma. The judge concluded that "under the circumstances of this case the stop and resultant seizure [were] unconstitutional." The judge's conclusion centered on her finding that Donaruma lacked reasonable suspicion of

11

defendant's participation in a crime, which should have prevented him from pulling her over.

Initially, the judge rejected the State's contention that the detectives' repeated attempts to contact defendant established reasonable suspicion of defendant's criminality. The judge found there was no evidence defendant received Donaruma's business card, and Donaruma never positively identified the woman who peered from behind the curtain as defendant. At best, the judge reasoned, "the only conclusion one could reach is that these circumstances did increase [Donaruma's] suspicion that defendant was avoiding contact." Yet, in the judge's view, that was insufficient to engender reasonable suspicion of defendant's involvement in a crime.

The judge noted that, at the time of the stop, law enforcement was "still investigating the matter to see if a felony had actually been committed, whether by Izzo alone and/or by someone yet unknown, perhaps with the aid of defendant." The judge emphasized that, while Donaruma knew defendant mailed a personnel file she ordinarily could not access, it was unclear whether Izzo had authorized her possession of it. Moreover, the judge highlighted Donaruma's testimony revealing that he intended solely to speak with defendant to further his investigation and was not suspicious of her involvement in a crime. For that reason, the judge concluded "it was improper

12

to seize the defendant merely to continue the investigation to determine what, if anything, of a criminal nature occurred."

Additionally, the judge held that, even if Donaruma had reasonable suspicion in the first instance that defendant had been involved in a crime, the stop was nevertheless unconstitutional because it was "not objectively reasonable." As defendant was neither a threat to public safety nor a flight risk, the judge concluded that Donaruma had no need to stop her. Instead, the judge explained, Donaruma "could have followed the defendant, wait[ed] for her to exit her vehicle, and thereafter attempt[ed] to speak with her."

## II.

The State argues the judge erred because Donaruma had a reasonable and articulable suspicion that defendant was involved in a crime, thereby justifying the stop. The State highlights how (1) Donaruma knew Izzo and Fornaciari were embroiled in a lawsuit; (2) Fornaciari's personnel file was missing and should not have left the building; (3) Izzo had access to the file; (4) Izzo was dating defendant; (5) defendant was caught on video with the file; and (6) defendant inscribed a false return address on the package ostensibly to cover her tracks.

The State reasons that, just as Izzo's improper removal of the personnel file would constitute official misconduct, so too would defendant's assistance

13

render her an accomplice to that illegal act. And given that detectives learned from an assistant prosecutor at the Hunterdon County Prosecutor's Office that official misconduct was a potential charge in their investigation, the State concludes Donaruma had reasonable suspicion of defendant's involvement in a crime.

The Attorney General aligns with the State, adding that defendant's furtive actions to avoid contact with the police augmented the reasonableness of Donaruma's suspicion. The Attorney General also underscores the reliability of Pietrefesa's original complaint that the personnel file was improperly removed and returned under false pretenses.

Defendant counters that Donaruma lacked reasonable suspicion to stop her, so this Court should suppress her statement as the fruit of an illegal stop. In her view, the testimony developed at the remand hearing reveals that, at the time of the stop, Detective Donaruma was "unsure that a crime had even been committed, let alone what [her] role was." Therefore, as the trial judge found, "a desire to talk to a potential witness" like defendant, particularly during the earliest stages of an investigation, "does not constitute reasonable and articulable suspicion required to justify an investigatory stop and detention." Defendant further suggests that even if the stop was initially constitutional, we must still suppress her statement because "[t]he means used in this case: a

baseless motor-vehicle stop, and then a lengthy, un-Mirandized interrogation, were wholly unreasonable."

For its part, the American Civil Liberties Union of New Jersey (ACLU) joins defendant, claiming "Donaruma stopped [her] (1) because he was impatient and (2) he wanted to speak with her about someone else's possible wrongdoing." The ACLU asserts Donaruma knew only "a few disconnected facts" that afforded nothing more than a mere hunch about her involvement in a crime, not a reasonable suspicion based on specific and articulable facts.

## III.

We deferentially review the trial judge's factual findings, crediting those "which are substantially influenced by [the] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy.'" State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We will not substitute the trial judge's findings of fact for our own simply because we may have drawn a different conclusion from the evidence. Ibid. Rather, "[a] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Ibid. (quoting Johnson, 42 N.J. at 162). That said, we owe no deference to the trial judge's legal conclusions, which we review de novo. State v. Hinton, 216 N.J. 211, 228 (2013).

15

IV.

A.

We first address the State's contention that Donaruma lawfully stopped defendant to obtain her roadside statement. "Both the United States and the New Jersey Constitutions protect citizens against unreasonable searches and seizures." State v. Mann, 203 N.J. 328, 337 (2010) (quoting State v. Amelio, 197 N.J. 207, 211 (2008)). Generally, a warrantless search or seizure is invalid absent a showing that it "falls within one of the few well-delineated exceptions to the warrant requirement." Id. at 337-38 (quoting Elders, 192 N.J. at 246). Those exceptions include investigatory stops, also known as Terry stops after the landmark United States Supreme Court decision, Terry v. Ohio, 392 U.S. 1 (1968).

Though the parties disagree on many issues in this appeal, they agree that Donaruma's encounter with defendant was such an investigatory stop. Therefore, we need not consider whether Donaruma seized defendant in the first instance. Rather, the State must now prove by a preponderance of the evidence that this presumptively invalid investigatory stop was constitutional. Mann, 203 N.J. at 337. If the State cannot meet its burden, then we will suppress the fruits of the stop: namely, defendant's roadside statement to

16

Donaruma. State v. Smith, 155 N.J. 83, 100 (1998) ("Evidence obtained as the fruit of an unlawful search or seizure must be suppressed.").

The State must show the stop was "based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." Mann, 203 N.J. at 338 (quoting State v. Pineiro, 181 N.J. 13, 20 (2004)). Put differently, we "must assess whether 'the facts available to the officer at the moment of the seizure . . . warrant[ed] a [person] of reasonable caution in the belief that the action taken was appropriate.'" Ibid. (quoting Pineiro, 181 N.J. at 21). While reasonable suspicion is a "lower standard" than probable cause, State v. Stovall, 170 N.J. 346, 356 (2002), "[n]either 'inarticulate hunches' nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights," State v. Arthur, 149 N.J. 1, 8 (1997) (quoting Terry, 392 U.S. at 21). We evaluate the totality of the circumstances to determine whether an officer had a reasonable suspicion that justified an investigatory stop. Pineiro, 181 N.J. at 22.

We have previously considered the constitutionality of a vehicular stop where the officer's suspicion was not based on an observed traffic violation. In State v. Amelio, the defendant's daughter called a police dispatcher to report a domestic disturbance at her home. 197 N.J. at 210. While officers

17

were en route she called back, this time informing the dispatcher that her father had drunkenly left their home, and providing the make, color, and license plate of his car. Ibid. With that knowledge, officers spotted the defendant's car and pulled him over, arresting him for driving while intoxicated and refusing to submit to a breathalyzer test. Ibid. We held the officers had a reasonable and articulable suspicion sufficient to justify the stop. Id. at 209. Besides the fact that his daughter provided an accurate description of his car, we emphasized that she identified herself in the call, thereby exposing herself to criminal prosecution if she had knowingly made a false report. Id. at 214. In that way, she lent credibility to the information she conveyed to the dispatcher and, in turn, to the arresting officers' suspicion that her father was driving while intoxicated. Ibid.

Similarly, in Arthur, a police officer surveilling an area "known for heavy narcotics activity" saw the defendant park his car, a person enter the car, and then that person exit with a paper bag she did not initially have. 149 N.J. at 3. After the defendant drove off, another officer stopped the former passenger, searched her bag, and found narcotics paraphernalia. Ibid. The surveilling officer radioed that information and a description of the defendant's car to his colleagues, who would later pull the defendant over and

arrest him.  Id. at 5-6.  In affirming the stop of the defendant's vehicle, we

explained

> [p]olice officers should consider whether a defendant's
> actions are more consistent with innocence than guilt;
> however, simply because a defendant's actions might
> have some speculative innocent explanation does not
> mean that they cannot support articulable suspicions if
> a reasonable person would find the actions are
> consistent with guilt.
>
> [Id. at 11.]

Because of a separate question surrounding the seizure of the passenger,

we considered the legality of the stop of the defendant's vehicle independent

of the fact that the passenger's bag was ultimately found to contain drug

paraphernalia.  Id. at 12.  Nevertheless, we affirmed the stop on the other facts

available to the officers at the time.  Id. at 12-13.  We highlighted that, while it

was true the officer conducting surveillance did not "literally" observe a drug

transaction between the passenger and the defendant, "it was readily inferable"

that the defendant's actions were more consistent with illegal narcotics activity

than another explanation even without the knowledge that the passenger's bag

contained drugs.  Id. at 11-12.  The defendant parked in a known area of high

drug traffic, a person entered his vehicle for only a few minutes then left with

a paper bag, that person "engaged in furtive movements upon exiting the

vehicle and tried to conceal the bag," and officers testified that paper bags

19

were often used for selling drugs.  Id. at 10.  We approved the stop, ascribing significance to "the rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise."  Ibid.; accord State v. Davis, 104 N.J. 490, 503 (1986) (citing with approval consideration of officer's "training and experience" in evaluation of investigatory stop).

Conversely, in State v. Maryland, as the defendant, his stepbrother, and a companion exited a commuter train, two undercover officers on graffiti patrol spotted the defendant place a brown paper bag in the waistband of his pants. 167 N.J. 471, 477 (2001).  The officers suspected him of concealing either a weapon or contraband.  Id. at 478.  After they stopped the defendant to ask what he was carrying, he turned his body slightly and reached into his waistband area, prompting a struggle with the officers that caused several bags of marijuana to spill onto the ground.  Ibid.  As relevant here, we found the officers' suspicion was insufficient to support the initial stop.  Id. at 486.  We compared the facts to Arthur and reasoned that, unlike in that case, these officers "observed nothing suggesting that a drug transaction had taken place." Id. at 487.  The officers were not on narcotics-surveillance duty and the train station was not a high drug traffic area.  Ibid.  At most, they saw the defendant carrying a paper bag in his waistband and had an inarticulate hunch that he

20

may have been engaged in illegal activity.  Ibid.  We underscored how they failed to explain why, in their experience, that act alone suggested the defendant was carrying drugs.  Ibid.

Those decisions reveal a highly fact-intensive inquiry.  Each case exists on a spectrum of permissible and impermissible investigatory stops.  Ultimately, we must place ourselves in the shoes of a reasonable officer and consider the knowledge available to Donaruma at the time he pulled defendant over.  Mann, 203 N.J. at 338; accord Terry, 392 U.S. at 21-22 ("[W]ould the facts available to the officer at the moment of the seizure . . . 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate?").  We discern from the record that Donaruma was aware of the lawsuit between Fornaciari and Izzo.  He also knew Fornaciari's personnel file had gone missing, and Izzo had the ability to access it.  He further recognized prosecutors could bring charges of official misconduct and misapplication of entrusted property based on what he discovered in the course of his investigation.  He saw the video of defendant mailing the file and inscribing a false return address on the package.  As a result, he attempted to contact defendant on multiple occasions -- even personally visiting her home -- to no avail.

21

Based solely on the foregoing, however, we find Donaruma could not have reasonably suspected defendant participated in a crime. The record supports the trial judge's finding that "the officers did not even know at the time that a crime had occurred." See Elders, 192 N.J. at 244 ("A trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" (quoting Johnson, 42 N.J. at 162)). Before stopping defendant, the detectives did not interview anyone besides Pietrefesa: not even Izzo. The record amply supports the judge's conclusion that, at the time of the stop, Donaruma was "still investigating the matter to see if a felony had actually been committed, whether by Izzo alone and/or by someone yet unknown, perhaps with the aid of defendant."

Donaruma's testimony on remand belies the State's assertion that Donaruma reasonably suspected defendant participated in a crime. When asked whether defendant was the target of his investigation, he replied "[s]he was not." When probed as to whether she was even a suspect, he answered "[s]he was not at that time." For that reason, he explained how he did not stop defendant with the intent of arresting her because he "had no reason to." His statements to defendant at the police station after their roadside encounter are consistent with his testimony. Donaruma told defendant five times that she

22

was neither "the target" nor "the focus" of the investigation. Instead, he explained that Izzo was "being investigated for official misconduct. . . . What you are now is a participating <u>contact</u>, okay." (emphasis added).

Donaruma's statements reveal that Izzo was the object of the police's focus at the time of the stop. He testified they "were just doing an investigation of Mr. Izzo at that point." But, as to defendant, he stated, "[a]t that point in time, I didn't know what was in the package, that she put that stuff in the package. She was just mailing the package." It is obvious, then, that Donaruma stopped defendant to develop his investigation into Izzo. He was neither subjectively aware a crime had been committed nor suspicious of defendant's involvement in such a crime. At best, he had an "inarticulate hunch," but he could not -- and, unsurprisingly, did not -- reasonably consider defendant to be a suspect. <u>See</u> <u>Arthur</u>, 149 N.J. at 8 (quoting <u>Terry</u>, 392 U.S. at 21).

From an objective perspective, defendant's actions on the post office surveillance footage -- her only link to the investigation to that point besides her relationship with Izzo -- were not reasonably more consistent with guilt than innocence. <u>See</u> <u>Arthur</u>, 149 N.J. at 11. Moreover, the police here did not have a reliable tip concerning defendant's commission of a specific crime. Rather, they had a report from Pietrefesa that the personnel file mysteriously

23

returned to the construction office, as well as a suggestion from the assistant prosecutor that the file's removal could lead to charges "depending on . . . how this envelope left the building." That defendant did not respond to the officers' calls or visits does not alter our conclusion. To be sure, a blatant attempt to hide from the police can augment suspicion. See State v. Valentine, 134 N.J. 536, 551 (1994) (finding stop-and-frisk was reasonable because, among other things, the defendant "ducked behind a tree after seeing [a] police vehicle"). However, the trial judge noted "[t]here was no specific testimony setting forth" the conclusion that Donaruma became suspicious due to defendant's elusive behavior. The judge further found "Donaruma could not recall if he left any voice messages," and there was neither "evidence that defendant received the business card . . . [nor] positive identification of the woman in the window."

Viewing the facts cumulatively, we cannot agree with the State that there was reasonable suspicion "based on specific and articulable facts" of defendant's involvement in a crime. See Mann, 203 N.J. at 338 (quoting Pineiro, 181 N.J. at 20). And, absent reasonable suspicion, Donaruma could have furthered the investigation by conducting a field inquiry. See State v. Rosario, 229 N.J. 263, 271 (2017) ("A field inquiry is essentially a voluntary encounter between the police and a member of the public in which the police

24

ask questions and do not compel an individual to answer."). To the extent defendant still refused to speak with him but the information she possessed was vital to his investigation, a subpoena would be the next step. See R. 1:9-1. In other words, there were alternatives available to Donaruma short of activating his overhead lights and pulling defendant over just to ask her questions. A law enforcement officer cannot use an automobile stop merely for the purpose of a police interview.

We reiterate that "our constitutional jurisprudence evinces a strong preference for judicially issued warrants" and an investigatory stop is an exception justified only by reasonable suspicion of involvement in a crime. Elders, 192 N.J. at 246. To validate such a stop, the State must proffer more than disconnected facts supporting varying conclusions about a defendant's conduct; rather, the State should highlight specific and articulable facts which, taken together with rational inferences from those facts, demonstrate how the defendant's actions were more consistent with guilt than innocence, thereby amounting to reasonable suspicion of criminal activity. In short, an officer cannot conduct an investigatory stop without observing a traffic violation or having a reasonable suspicion of other criminal activity. We hold that the State failed to meet its burden here. Because we have determined that the stop

was unconstitutional, we need not address defendant's additional argument that the scope of the stop was unreasonable.

B.

The State and the Attorney General also argue that, even if the stop was unconstitutional, defendant's incriminating statement is admissible because it was sufficiently attenuated from the stop. Specifically, they contend that, after defendant told Donaruma she would speak with him in a more private location, Donaruma's repeated indications to her that she was free to leave constituted intervening circumstances rendering her statements admissible. We disagree.

Though ordinarily we apply the exclusionary rule to the fruits of an unlawful stop, we will not exclude evidence sufficiently attenuated from the taint of the stop. State v. Worlock, 117 N.J. 596, 621 (1990) (relying on Wong Sun v. United States, 371 U.S. 471, 486 (1963)). To determine whether a statement is accordingly attenuated, we examine three factors: "(1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct." State v. Williams, 192 N.J. 1, 15 (2007) (quoting State v. Johnson, 118 N.J. 639, 653 (1990)); accord Brown v. Illinois, 422 U.S. 590, 603-04 (1975).

26

Because the length of time between the initial stop and the subsequent statement can lead to ambiguity, it is the least important factor. State v. Shaw, 237 N.J. 588, 614-15 (2019) ("[A] long detention could suggest increasing pressure or dissipation of the initial shock of arrest, and a short detention could indicate the confession was a product of the initial shock or that the confession was unrelated to the arrest."). This factor also necessarily involves consideration of the conditions of the unlawful detention. Id. at 615.

Next, we weigh the purported intervening circumstances, which "can be the most important consideration." Ibid. In response to an unconstitutional stop, "the State should show some 'demonstrably effective break in the chain of events.'" Worlock, 117 N.J. at 623-24 (quoting Brown, 422 U.S. at 611 (Powell, J., concurring)). For example, we have found that resisting arrest and eluding the police after an unconstitutional stop can constitute intervening acts justifying admission of later-obtained evidence. See, e.g., Williams, 192 N.J. at 16. Conversely, the United States Supreme Court reversed a conviction based on an improperly admitted confession because the police's Miranda warnings were insufficient to purge the taint of an illegal arrest. Dunaway v. New York, 442 U.S. 200, 218-19 (1979).

Last, the flagrancy and purpose of the arrest "is particularly relevant" to determining whether evidence is the fruit of the arrest. Shaw, 237 N.J. at 615.

For instance, we may favor exclusion in spite of intervening circumstances where police conduct was "calculated to cause surprise, fright, and confusion." Brown, 422 U.S. at 605. However, where the police acted in good faith or their "conduct was more casual than calculating," this factor weighs in favor of admission. Worlock, 117 N.J. at 624.

As applied here, we hold defendant's statement to Donaruma was not so attenuated from the initial stop as to avoid exclusion. Specifically, we find the first factor favors admission. Approaching an hour, their encounter was somewhat long. However, under these circumstances, the length of the stop more likely suggests that the initial shock of the stop had worn off, as there is no indication in the record that increasing pressure from Donaruma yielded defendant's statement. Indeed, Donaruma was not overbearing, allowed defendant to move to a less conspicuous location, and never asked her to leave her vehicle. Yet, this is the least significant factor.

More importantly, the second factor weighs in defendant's favor. Donaruma's repeated indications that she was free to leave by no means purged the taint of the initial stop. His assurances did not change the character of the conversation -- which was plainly the product of the initial stop – to arise by virtue of defendant's own volition. There were no intervening circumstances or events between the stop and defendant's statement, such as

28

defendant seeking counsel. Instead, Donaruma's admonitions are similar to the <u>Miranda</u> warnings the United States Supreme Court has already ruled to be insufficient to break the chain of causation. <u>See</u> <u>Dunaway</u>, 442 U.S. at 218-19.

Finally, we find the third factor to be in equipoise. While we do not believe Donaruma's conduct was calculated or purposefully unconstitutional, we do note that, by his own admission, Donaruma pulled defendant over without any suspicion of her participation in a crime. That type of constitutional violation cannot support the admission of what it may later yield.

On balance, then, we hold the factors weigh in favor of exclusion. We cannot condone the admission of evidence stemming from the unconstitutional detention of a person where the police simply state the detainee is free to leave. In our view, that is a bridge too far. We therefore apply the exclusionary rule to defendant's roadside statement. And, having disposed of defendant's statement implicating Izzo and leading to his arrest, we reverse her convictions for false reporting and hindering apprehension, which were based entirely on that statement.

## C.

Finally, defendant asks us to reverse her burglary conviction. She asserts the extensive testimony at trial concerning her roadside statement, in

which she lied and falsely implicated Izzo, irreparably damaged her credibility with the jury. She claims the admission of that statement made it impossible to rebut the State's assertion that she had entered Izzo's truck without permission.

Because defendant initially failed to challenge the admission of her roadside statement on Fourth Amendment grounds, we review its application to her burglary charge for plain error. R. 2:10-2. We must disregard any unchallenged errors or omissions unless they are "clearly capable of producing an unjust result." Ibid. We have noted that is a "high bar," State v. Santamaria, 236 N.J. 390, 404 (2019), requiring reversal only where the possibility of an injustice is "real" and "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached," State v. Macon, 57 N.J. 325, 336 (1971).

To prove burglary, the State must show that defendant entered a "structure" with the purpose to commit an offense therein, unless she was "licensed or privileged" to enter. N.J.S.A. 2C:18-2(a)(1); see also N.J.S.A. 2C:18-1 (providing that "structure" includes a car). Consequently, permission to enter a vehicle negates an element of burglary, unless the defendant exceeds that permission by committing an offense therein. See State ex rel. Qarmout v. Cavallo, 340 N.J. Super. 365, 368-69 (App. Div. 2001). Yet, the defendant

30

will not be guilty if the defendant committed that offense by accident. See N.J.S.A. 2C:18-2(a) (requiring intent to commit an offense while entering a structure to prove burglary).

Defendant's guilt, therefore, hinged on whether she had permission to enter Izzo's truck. While Izzo testified that he never gave such permission, defendant informed police that, on the night of the alleged burglary, Izzo told her "you know where the shit is, my truck is always open, go get it." She stated she had left items such as "clothing" and "a little umbrella" in his truck. As she explained to police, she took the personnel file by accident because it was among her personal effects: "I thought I was taking my possessions." If the jury believed defendant's version of events, then it would not have found her guilty of burglary.

Yet, this was unlikely in light of the State's exploitation of contradictions between defendant's roadside statement and the statement she gave to police on October 2. The prosecutor's opening statement was a lengthy indictment of defendant's credibility, pitting her against both Donaruma and Izzo. The prosecutor highlighted six contradictions between the two stories defendant gave police, including whether (1) defendant and Izzo were still dating at the time she mailed the package; (2) defendant herself mailed the package; (3) she did so at Izzo's behest; (4) they drafted the letter

31

to Fornaciari together; (5) she intentionally listed the wrong return address; and (6) she sent the package to get Fornaciari and Stockelberg or Izzo in trouble.  The prosecutor further elicited those contradictions through Donaruma's account of the roadside statement given at trial and by playing defendant's recorded statement on October 2 for the jury.

The prosecutor recognized the connection between the burglary charge and defendant's credibility.  As she told the jury in her closing,

> So, what do we have here?  You have Phil Izzo's statement and her statements about the truck.
>
> . . . .
>
> Who is being honest here?  And so, finally, the officers that had enough and they said to [defendant], tell us the truth.  Tell us the whole truth.  And finally, after four hours, she says, well, I took it.  I took a package.  I took the papers but I didn't know I had them.  You see?  Four hours to get to that.  She knew she had it the whole time.  She knew what she took.  She knew when she took it and she knew it was wrong and she couldn't bring herself to say it.  Why?  Because she doesn't like to tell the truth.  She has a hard time and that's okay, ladies and gentlemen.  That's your job.  That's your job now.  You get to determine how truthful she is.

Accordingly, by underscoring defendant's lack of credibility, the prosecutor effectively rebutted defendant's claim that she had permission to enter Izzo's truck, and the jury found her guilty of burglary.

Nevertheless, additional facts in the record support defendant's claim that she had permission to enter the truck. Izzo left his truck unlocked and failed to report to the police that it had been burgled. Phone records indicate they had lengthy communications both before and after the day of the alleged burglary, perhaps, in part, to arrange for defendant to collect her belongings. Moreover, Izzo rarely patronized the bar in question, making it unlikely defendant would know to find him there and break into his truck unless he informed her of his plans. In addition, Izzo had his own credibility issues. He turned out to have removed Fornaciari's personnel file from the construction office without permission. He lied to Pietrefesa by telling him the personnel file was missing.

Had the trial court initially excluded defendant's roadside statement, defendant's credibility would have remained intact because the State would never have had the opportunity to highlight the falsehoods she told Donaruma. In what then amounts to a credibility battle between defendant and Izzo -- who has credibility issues -- she had a robust defense to the burglary charge. Therefore, in our view, the admission of the roadside statement was "clearly capable of producing an unjust result," R. 2:10-2, because there is reasonable doubt as to whether the jury would have found defendant guilty of burglary in its absence, see Macon, 57 N.J. at 336. We do not pass judgment on the merits

33

of whether defendant burgled Izzo's truck. We hold only that the admission of her roadside statement substantially diminished the chances she could receive a fair trial. Accordingly, having already discarded the roadside statement as the product of an illegal stop, we reverse defendant's conviction for third-degree burglary.

V.

We agree with the trial judge's determination that the investigatory stop was unconstitutional. We therefore affirm the Appellate Division's reversal of defendant's convictions for hindering apprehension and false reporting. We further reverse defendant's conviction for burglary, and remand for proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE'S opinion.